## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| **JUANA SEGOVIA, individually and** | § | |
| **As Personal Representative of the** | § | |
| **Estate of JUAN SEGOVIA RAMIREZ,** | § | |
| **MANUEL SEGOVIA, individually,** | § | |
| **ANGIE SEGOVIA, individually, and** | § | |
| **EVELYN SEGOVIA, individually,** | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | **CIVIL ACTION NO. 3:21-cv-1514** |
| | § | |
| **CITY OF DALLAS, TEXAS,** | § | |
| **ALEXIS BOOKER-LEWIS,** | § | |
| **ASHLEIGH WARREN,** | § | |
| **MICHAEL RUMSEY,** | § | |
| **CRAIG HOUSTON,** | § | |
| **ROBERT BECK,** | § | |
| **KENNETH BROWN,** | § | |
| **MAXWELL BOECKEL, and** | § | |
| **RODNEY FEATHERSTON,** | § | |
| *Defendants*. | § | |

## PLAINTIFFS' ORIGINAL COMPLAINT

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF

**TO THE HONORABLE UNITED STATES DISTRICT JUDGE:**

COMES NOW, JUANA SEGOVIA, individually and as Personal Representative of the Estate of JUAN SEGOVIA RAMIREZ, MANUEL SEGOVIA, individually, ANGIE SEGOVIA, individually, and EVELYN SEGOVIA, individually, Plaintiffs, complaining of CITY OF DALLAS, TEXAS, ALEXIS BOOKER-LEWIS, ASHLEIGH WARREN, MICHAEL RUMSEY, CRAIG HOUSTON, ROBERT BECK, KENNETH BROWN, MAXWELL BOECKEL, and RODNEY FEATHERSTON, and for causes of action will respectfully show unto the Court as follows:

> "There is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help."

*Fielder v. Bosshard*, 590 F.2d 105, 108 (5th Cir. 1979).

## SUMMARY

If fraternity brothers at a party dumped a drunk, unconscious, and non-responsive pledge in a back room where no medical attention would be provided until he died, they would be criminally charged in that death. This is precisely what happened in this case, only instead of fraternity brothers, they were Dallas Police Officers and Jailers.

On June 30, 2019, Juan Segovia was extremely intoxicated to the point that he became unconscious, non-responsive, and his body was limp like a ragdoll. Instead of taking him to the hospital, Dallas Police Officers Robert Beck and Kenneth Brown lifted him into the back of Officer Beck's police car and placed him in the back seat face down, his hands cuffed behind his back, as he remained non-responsive and not moving while Officer Beck drove him to the City Detention Center (CDC) – known as the drunk tank.

Around 9:45 p.m., Officers Beck and Brown placed Juan's limp body into a wheelchair and wheeled him into the CDC. Once inside, Deputy Marshal Alexis Booker-Lewis attempted to ask Juan questions to fill out his medical intake sheet, but all Juan could muster was a grunt. When Sergeant Michael Rumsey attempted to inform Juan why he was there, Booker-Lewis had to physically hold Juan's head up. When Booker-Lewis let go of his head, Juan's head just flopped down completely unresponsive. Everyone laughed at how intoxicated Juan was – but no one sought to get him medical attention.

At 10:13 p.m., Booker-Lewis then wheeled Juan upstairs where she met Deputy Marshal Ashleigh Warren. Booker-Lewis and Warren attempted to get Juan out of the wheelchair and into his cell; however, Juan's unconscious body was completely flaccid and non-responsive. Booker-Lewis and Warren can be seen on video surveillance dumping Juan's lifeless body onto the ground and walking out of the cell.

3

Around 11:00 p.m., Deputy Marshal Craig Houston did a walk-through check in Juan's cell and noticed that Juan was unconscious and non-responsive; however, Houston left the cell without seeking medical attention. Throughout the night, Booker-Lewis and Warren fabricated observations and cell checks that video surveillance shows did not occur. Booker-Lewis, Warren, and Houston were aware that Juan had been unconscious since his arrival to the CDC yet collectively and individually they did nothing to get Juan any medical attention or help of any kind.

At 4:57 a.m., Houston brought Rumsey to check on Juan. Rumsey attempted to wake Juan, but Juan was completely non-responsive. Rumsey also saw that Juan had vomited during the night while he lay unconscious on the floor of the cell. By this time, Rumsey was aware that Juan had been unconscious at the CDC for over seven hours, but left the cell and continued not to seek medical attention. At 6:00 a.m., when Rumsey's shift ended, he finally alerted the supervisor taking his place that someone needed to check on Juan. At 6:15 a.m., paramedics saw Juan and took him to the hospital where he died days later.

The Defendants were acting pursuant to the City's policies and practices of ignoring the obvious risks to intoxicated persons in their custody. It was the practice at the CDC to allow intoxicated, unconscious, and non-responsive arrestees to suffer in cells without medical care until they died – which has resulted in multiple deaths in the CDC.

Plaintiffs now file this lawsuit against the City of Dallas and these individual defendants for the wrongful death of their son and father and for violating Juan's constitutional rights under the Fourteenth Amendment to the United States Constitution to receive adequate medical care as a pre-trial detainee.

The Defendants' cruel refusal to provide obviously necessary medical care directly caused the tragic and preventable death of Juan Segovia. The question is whether these officials breached their constitutional duty to tend to the basic human needs of persons in their charge. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996). In this case, the answer is a resounding, yes.

## I.
## <u>Parties</u>

1.    Plaintiff Juana Segovia is an individual residing in Dallas County, Texas.

2.    Plaintiff Manuel Segovia is an individual residing in Dallas County, Texas.

3.    Plaintiff Angie Segovia is an individual residing in Dallas County, Texas.

4.    Plaintiff Evelyn Segovia is an individual residing in Dallas County, Texas.

5.    Defendant City of Dallas, Texas is a political subdivision of the State of Texas located in the Northern District of Texas. Defendant City of Dallas, Texas can be served through its City Manager, T.C. Broadnax, at 1500 Marilla St., Dallas, Texas 75201, or wherever he may be found.

6.    Defendant Alexis Booker-Lewis is an individual residing in Dallas County, Texas, and at all times relevant to this lawsuit was a deputy marshal with the City of Dallas Marshal's Office working in the City Detention Center and may be served at her residence in Dallas, Texas or wherever she may be found. Defendant Booker-Lewis is being sued in her individual capacity.

7.    Defendant Ashleigh Warren is an individual residing in Dallas County, Texas, and at all times relevant to this lawsuit was a deputy marshal with the City of Dallas Marshal's Office working in the City Detention Center and may be served at her residence

in Dallas, Texas or wherever she may be found. Defendant Warren is being sued in her individual capacity.

8.      Defendant Michael Rumsey is an individual residing in Dallas County, Texas, and at all times relevant to this lawsuit was a deputy marshal with the City of Dallas Marshal's Office working in the City Detention Center and may be served at his residence in Dallas, Texas or wherever he may be found. Defendant Rumsey is being sued in his individual capacity.

9.      Defendant Craig Houston is an individual residing in Dallas County, Texas, and at all times relevant to this lawsuit was a deputy marshal with the City of Dallas Marshal's Office working in the City Detention Center and may be served at his residence in Dallas, Texas or wherever he may be found. Defendant Houston is being sued in his individual capacity.

10.      Defendant Robert Beck is an individual residing in Dallas County, Texas, and is a police officer with the City of Dallas Police Department and may be served at his place of employment at the City of Dallas Police Department located at 1400 S. Lamar, Dallas, Texas 75215 or wherever he may be found. Defendant Beck is being sued in his individual capacity.

11.      Defendant Kenneth Brown is an individual residing in Dallas County, Texas, and is a police officer with the City of Dallas Police Department and may be served at his place of employment at the City of Dallas Police Department located at 1400 S. Lamar, Dallas, Texas 75215 or wherever he may be found. Defendant Brown is being sued in his individual capacity.

12.      Defendant Maxwell Boeckel is an individual residing in Dallas County, Texas, and may be served at his place of employment at the City of Dallas Fire-Rescue

located at 1500 Marilla Street, Dallas, TX 75201 or wherever he may be found. Defendant Boeckel is being sued in his individual capacity.

13.     Defendant Rodney Featherston is an individual residing in Dallas County, Texas, and may be served at his place of employment at City of Dallas Fire-Rescue located at 1500 Marilla Street, Dallas, TX 75201 or wherever he may be found. Defendant Featherston is being sued in his individual capacity.

## II.
## Jurisdiction and Venue

14.     The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 and § 1343 since Plaintiff is suing for relief under 42 U.S.C. § 1983.

15.     Venue is proper in the Northern District of Texas pursuant to 28 U.S.C. § 1391 because the Defendants are domiciled and/or reside in the Northern District of Texas, and all or a substantial part of the cause of action accrued in the Northern District of Texas.

## III.
## Facts and Allegations

16.     At all times relevant to this lawsuit, Juan Segovia (hereinafter referred to as "Juan") was held as a pre-trial detainee in the City of Dallas Detention Center (hereinafter referred to as "CDC" or "jail").

17.     At all times relevant to the subject matter of this litigation, Defendant City of Dallas (hereinafter referred to as "Dallas" or "City") operated the CDC where Juan was detained.

18.     The CDC is commonly known as the "Drunk Tank" due to it being the city facility where individuals arrested on public intoxication charges are taken and held until released.

19.     At all times relevant to the subject matter of this litigation, Defendant Ashleigh Warren (hereinafter referred to as "Defendant Warren") was an employee of the City, working in the CDC, and who was following the City's policies, practices, customs, and training.

20.     At all times relevant to the subject matter of this litigation, Defendant Alexis Booker-Lewis (hereinafter referred to as "Defendant Booker-Lewis") was an employee of the City, working in the CDC, and who was following the City's policies, practices, customs, and training.

21.     At all times relevant to the subject matter of this litigation, Defendant Michael Rumsey (hereinafter referred to as "Defendant Rumsey") was an employee of the City, working in the CDC, and who was following the City's policies, practices, customs, and training.

22.     At all times relevant to the subject matter of this litigation, Defendant Craig Houston (hereinafter referred to as "Defendant Houston") was an employee of the City, working in the CDC, and who was following the City's policies, practices, customs, and training.

23.     At all times relevant to the subject matter of this litigation, Defendant Robert Beck (hereinafter referred to as "Defendant Beck") was an employee of the City, working for the Dallas Police Department, and who was following the City's policies, practices, customs, and training.

24.     At all times relevant to the subject matter of this litigation, Defendant Kenneth Brown (hereinafter referred to as "Defendant Brown") was an employee of the City, working for the Dallas Police Department, and who was following the City's policies, practices, customs, and training.

25.     At all times relevant to the subject matter of this litigation, Defendant Maxwell Boeckel (hereinafter referred to as "Defendant Boeckel") was an employee of the City, working for Dallas Fire-Rescue, and who was following the City's policies, practices, customs, and training.

26.     At all times relevant to the subject matter of this litigation, Defendant Rodney Featherston (hereinafter referred to as "Defendant Featherston") was an employee of the City, working in for Dallas Fire-Rescue, and who was following the City's policies, practices, customs, and training.

27.     People in the custody of the Dallas Police Department and Dallas Fire-Rescue are dependent upon the City, and their employees to provide them with medical care.

28.     People incarcerated within the CDC are dependent upon the City, and their employees to provide them with medical care.

29.     Prisoners are not free to seek their own care, even if they can pay for it.

**The City of Dallas has a History of Showing
Deliberate Indifference Toward Intoxicated Inmates**

30.     The following shocking examples display the deliberate indifference the City has shown toward intoxicated people who were in obvious need of medical attention, who are incarcerated in the CDC, and who died as a result of receiving no medical care.

**Deaths Caused by the City's Deliberate Indifference in the CDC**

31.     With the exception of Hirschell Fletcher, Jr., the following instances of deliberate indifference leading to death were found on the Attorney General's list of in custody death reports.

32.     Upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of deliberate indifference leading to the death of individuals in the custody of the CDC who were in obvious need of medical care but were for some reason not listed on the Attorney General's list of in custody death reports, like Mr. Fletcher below.

### Diamond Ross

33.     In August 2018, Diamond Ross died after being unresponsive at the CDC. She was allowed to be booked into the CDC instead of being given appropriate medical care that she obviously needed. She was not appropriately monitored while in the CDC. Ms. Ross was under the influence of drugs to the point that she was placed in a wheelchair because she was unable to stand and was unable to communicate. She was not provided medical care upon entry to the jail and medical cervices were not called until it was far too late.

### Hirschell Fletcher, Jr.

34.     In December 2016, Hirschell Fletcher, Jr. died after being unresponsive at the CDC. He was allowed to be booked into the CDC instead of being given appropriate medical care that he obviously needed. He was not appropriately monitored while in the CDC. Fletcher laid underneath a mattress in his cell and was ignored by the officers who passed by intermittently. He was found unresponsive in his cell the following day and died due to a bleed caused by head injuries he sustained prior to entering the CDC which were obvious due to blood on his head and his conduct.

35.     Mr. Fletcher's death is shockingly similar to Juan's.

36.     Suspiciously, Defendant Warren was working and responsible for monitoring both Mr. Fletcher the night he became unresponsive in the CDC and Juan the night he was unresponsive in the CDC before each of their deaths.

## William Drake

37.     In August 2015, William Drake died after being unresponsive at the CDC. Drake was arrested after being found on the ground and highly intoxicated. He was allowed to be booked into the CDC instead of being given appropriate medical care that he obviously needed. He was not appropriately monitored while in the CDC. The City's personnel found Drake unresponsive and dead in his cell after not being properly monitored.

## Brian Hunter

38.     In October 2013, Brian Hunter was arrested and taken to the CDC. He was allowed to be booked into the CDC instead of being given appropriate medical care. Hunter was moved to an isolation cell and was not appropriately monitored while in the CDC. As a result, the following morning he was found unresponsive in his cell and transported to the hospital after it was too late, where he was pronounced deceased.

## Frank Gaddy

39.     In March 2013, Frank Gaddy was arrested for public intoxication after being unable to walk unassisted and being obviously intoxicated. He was allowed to be booked into the CDC instead of being given appropriate medical care that he obviously needed. He was not appropriately monitored while in the CDC. As a result, the following morning he was found unresponsive in his cell where he was determined to be deceased.

## Adrian Johnson

40.    In March 2010, Adrian Johnson was arrested for public intoxication after being found on the ground with his head propped up on a fence and being obviously intoxicated. He was wheeled into the CDC due to being unable to walk and going in and out of consciousness. He was allowed to be booked into the CDC instead of being given appropriate medical care that he obviously needed. He was not appropriately monitored while in the CDC. Johnson was found with foam around his mouth, but medical care was not requested for hours until it was too late.

## Juan Robles

41.    In October 2007, Juan Robles was arrested while extremely intoxicated and taken to the CDC. The arresting officers had to carry Robles from their patrol car into the CDC's intake area because he was too intoxicated to walk on his own. He was allowed to be booked into the CDC instead of being given appropriate medical care that he obviously needed. He was not appropriately monitored while in the CDC. The following morning Robles was found unconscious in his cell with blood in the vomit next to him. He was transported to the hospital after it was too late and he was pronounced dead.

## Matthew Layton

42.    In July 2007, Matthew Layton was arrested for public intoxication and taken to the CDC after being found asleep and acting disoriented. He was allowed to be booked into the CDC instead of being given appropriate medical care that he obviously needed. He was not appropriately monitored while in the CDC. During the night, Layton had vomited, turned purple, and stopped breathing. CDC personnel found Layton and called for medical attention after it was too late. He was pronounced dead.

### Clarence Nobles

43.    In March 2004, Clarence Nobles was arrested and taken to the CDC. He was allowed to be booked into the CDC instead of being given appropriate medical care. He was not appropriately monitored while in the CDC. CDC personnel found Nobles unresponsive in his cell. Medical attention was called after it was too late and Nobles was pronounced dead.

### Cardon Martin

44.    In March 1997, Cardon Martin was arrested for public intoxication and taken to the CDC. He was allowed to be booked into the CDC instead of being given appropriate medical care that he obviously needed. He was not appropriately monitored while in the CDC. When CDC personnel finally check on him the following morning, Martin was lying face down, was blue, and had been dead for several hours.

### Non-Fatal Injuries Caused by the City's Deliberate Indifference in the CDC

45.    Additionally, upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of deliberate indifference causing non-fatal injuries and suffering to individuals in the custody of the CDC who were in obvious need of medical care but would not be listed on the Attorney General's list of in custody death reports because they did not die, like Mr. Nascimento below.

### Carlos Nascimento

46.    In January 2020, Carlos Nascimento was arrested for public intoxication and booked into the CDC. He was allowed to be booked into the CDC instead of being given appropriate medical care that he obviously needed due to his multiple requests to see a doctor. He was not appropriately monitored while in the CDC. He complained of

having seizures, not having his medicine, and needing a doctor multiple times; however, he was denied medical care or attention until it was too late, and he ultimately suffered the seizure he had been warning the jailers about since he arrived at the jail.

47.     While Nascimento's incident post-dated Juan's death in the CDC due to the Defendants' deliberate indifference, Nascimento's incident demonstrates that there are other instances of deliberate indifference that do not lead to the death of individuals in the CDC and which would only be uncovered through discovery into information within the knowledge of the City.

## The City Maintained Deliberately Indifferent Policies and Practices Which Caused the Death of Juan Segovia

48.     The customs and practices at the CDC were not to follow the formal written policies and created *de facto* policies which were the custom of the officers working at the CDC. Defendants Booker-Lewis, Warren, Rumsey, and Houston were following these *de facto* policies when they showed subjective deliberate indifference toward Juan's health and safety. These policies caused their deliberate indifference and ultimately Juan's death.

1.1.5.   The prisoner is in acceptable physical and mental condition to be booked into the City Detention Center at the discretion of the supervisor, either by personal contact on the book in floor or having the arrested person brought to the Sergeant's desk.

49.     The formal policy at the CDC is to ensure that the prisoner is in acceptable physical and mental condition prior to being booked into the CDC.

50.     However, the *de facto* policy based off the practice and custom followed at the CDC is to permit arrestees to be booked into the CDC even if they are intoxicated to

14

the point that they are incoherent, unconscious, unable to walk or talk, unable to control their bowels, or unable to respond to questions.

51.     Examples of the de facto policy are Juan – who was unconscious, unable to respond, and his body was limp like a ragdoll and the other incidents listed above.

52.     Notably, as part of the investigation following the death of Hirschell Fletcher, Jr., Officer Harry Bradfield, #119829, of the Dallas Marshal's Office wrote an affidavit stating that he did the book-in for Fletcher and at the time, Fletcher "had defecated on himself and was too intoxicated to comply with CDC rules."

53.     However, Bradfield also explained that "Dallas PD also advised that he had been checked out by Dallas Fire & Rescue #4" so Fletcher was completely book in [*sic*] and escorted upstairs and placed in a single cell."

54.     Upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of arrestees being booked into the custody of the CDC who were in obvious need of medical care and were not in acceptable physical and mental condition but were booked into the CDC anyway.

55.     Alternatively, the City has an unconstitutional policy of deeming arrestees to be in acceptable physical and mental condition to be booked into the CDC even if they are incoherent, unconscious, unable to walk or talk, unable to control their bowels, or unable to respond to questions. This policy creates an environment where dangerously intoxicated individuals in need of immediate medical attention are placed in cells where they will be denied the medical care they need until they suffer serious injuries or death.

1.1.23. That no prisoners are accepted in the Detention Center who are seriously injured, seriously ill or intoxicated to the degree of being life threatening. These individuals must be evaluated by the Dallas Fire and Rescue staff prior to being accepted.

56.     The formal policy at the CDC is to ensure that no prisoners are accepted in the CDC who are seriously intoxicated to the degree of being life threatening and that these individuals must be evaluated by the Dallas Fire and Rescue staff prior to being accepted.

4.1.    Severely intoxicated persons are those persons who are intoxicated to the degree that they have lost control of normal body functions, or unconscious. These persons should be evaluated by the Dallas Fire and Rescue staff.

57.     The formal policy at the CDC goes on to explain that severely intoxicated persons are "persons who are intoxicated to the degree that they have lost control of normal body functions, or unconscious."

58.     Reading these two formal policies together, it appears no prisoners should be accepted who are intoxicated to the degree that they have lost control of normal body functions, or unconscious.

59.     This would be a good policy, unfortunately, even the City's formal policy contradicts itself.

4.3.    Severely intoxicated prisoners should be assigned to a single cell.

5. Prisoners exhibiting the following conditions must be segregated and kept under observation in a single cell and may require more frequent monitoring:

5.1.        The extremely intoxicated

60.     Thus, the formal policy at the CDC does not prohibit persons who are intoxicated to the point of losing normal body functions or unconscious; but instead, states those people should be housed in a single cell away from others who may be able to alert officers that these dangerously intoxicated people need help.

61.     However, the *de facto* policy based off the practice and custom followed at the CDC is to permit arrestees to be booked into the CDC even if they are intoxicated to the point that they are incoherent, unconscious, unable to walk or talk, unable to control their bowels, unable to respond to questions, and are clearly intoxicated to the degree of being life threatening.

62.     And while that is the *de facto* policy, based off of the practice and custom of officers in the CDC as is shown with Juan's case, Fletcher's case, and the list of other cases above in this lawsuit, it also appears that this is the formal policy as well.

63.     Interestingly, the formal policy requires these people who are dangerously intoxicated to be evaluated by Dallas Fire and Rescue. However, the practice and custom creating the de facto policy at the CDC is to simply rely on the arresting officers to say that Dallas Fire and Rescue already cleared the arrestee at the scene of the arrest. Thus, the dangerously intoxicated arrestee is not evaluated by Dallas Fire and Rescue at the CDC despite the amount of time that has passed between when they were evaluated at the scene – if they were evaluated at all, unlike Juan in this case – and despite their condition worsening between that evaluation and their entry to the CDC.

64.     When Juan was unconscious and limp in a wheelchair while being booked into the CDC, Defendant Booker-Lewis wrote on his Medical Screening Form that Dallas Fire and Rescue #8 had already cleared him on the scene, thus he did not need to be re-evaluated at the CDC.

65.    When Mr. Fletcher was "too intoxicated to comply with CDC rules," Officer Bradfield wrote that "Dallas PD also advised that he had been checked out by Dallas Fire and Rescue #4."

66.    Clearly, the de facto policy at the CDC is that if an arresting officer states the arrestee was cleared at some time earlier in the day or night by Dallas Fire and Rescue, then it does not matter how intoxicated, how incoherent, how unconscious, or how dangerously intoxicated the arrestee is – they are already clear to be booked into the CDC.

67.    This is particularly true given the fact that the City chose not to have medical personnel on site at the CDC despite their own policy to book in and hold behind closed doors "persons who are intoxicated to the degree that they have lost control of normal body functions, or unconscious."

68.    Upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of arrestees being booked into the custody of the CDC who were in obvious need of medical care and were not evaluated by medical personnel because the arresting officer claimed the arrestee had already been cleared at some time earlier that date, despite the arrestee's conditions indicating they needed a new medical evaluation at the CDC.

5.4.2.    Summons the paramedics upon having knowledge of prisoner's displaying/having:

    5.4.2.1.    Chest pains

    5.4.2.2.    Difficulty breathing

    5.4.2.3.    Abdominal pains

    5.4.2.4.    Serious bleeding

    5.4.2.5.    Seizures

    5.4.2.6.    Unconsciousness

69.     The City's formal policy is for CDC officers to summon a paramedic upon having knowledge that a prisoner is, among other things, **unconscious**.

70.     However, the practice and custom at the CDC which has created the *de facto* policy, is not to summon paramedics if a person is unconscious and instead to house them as if they are not dangerously intoxicated and in need of immediate medical attention.

71.     This *de facto* policy is demonstrated by the fact that Defendants Beck and Brown took an unconscious arrestee into the CDC to book-in when they took Juan to the CDC, instead of to the hospital or somewhere else because they knew the CDC would take him. Additionally, Defendant Booker-Lewis did not summon a paramedic but conducted the book-in process as if Juan was not unconscious. Defendant Rumsey then explained the reason Juan was there to him and even noted that he knew Juan would not remember this (more detail regarding this interaction will be explained below). Defendant Rumsey approved Juan's book-in at the CDC despite Juan being unconscious the entire time Defendant Rumsey interacted with him. Defendant Warren did not summon a paramedic when she interacted with Juan, even after Defendant Warren and Defendant Booker-Lewis had to dump Juan's limp and unconscious body onto the ground because he could not get himself out of the wheelchair. Defendant Houston did not summon a paramedic when he saw that Juan was unconscious and did not even tell his supervisor, Defendant Rumsey, until over four hours later. Defendant Rumsey after personally seeing that Juan was still unconscious at 4:57 a.m. – over seven hours after first seeing Juan unconscious at the CDC still did not summon paramedics. It is clearly the *de facto* policy not to summon paramedics just because someone is unconscious, and the formal policy is not followed.

72.     Upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of arrestees being booked into the custody of the CDC who were unconscious, or who became unconscious while in the custody of the CDC, and paramedics were not notified.

3.  During the book-in procedure, the Detention Officer should complete an Intake Screening form (CTS-FRM-805) to establish if the prisoner is under the doctor's care or taking medication. The Detention Officer must advise the Watch Commander of the medication.

73.     The City's formal policy is for detention officers to complete Intake Screening Forms during the book-in process.

74.     These forms are where the book-in officer will ask the arrestee important information regarding their medical and mental health history, current medical and mental health status, note their observations of the arrestee including their physical appearance and their behavior, complete a suicide assessment of the arrestee, and note if Dallas Fire and Rescue have seen the arrestee prior to their arrival at the CDC – which according to the City's policy suffices for medical attention at the CDC.

75.     However, it is the *de facto* policy at the CDC not to fill these Intake Screening Forms out correctly, but instead to mark down "no" even if the answer is "yes" or if the arrestee is unable to communicate a response due to being unconscious.

76.     The following is the Intake Screening Form from when Hirschell Fletcher, Jr. was booked into the CDC before becoming unresponsive and dying just as the other individuals listed above, and eerily similar to Juan in this case.

**DALLAS MARSHAL'S OFFICE CITY DETENTION CENTER PRISONER INTAKE SCREENING FORM**

| | | | | | |
|---|---|---|---|---|---|
| Prisoner's Name | Fletcher, Hirschell | Date of Birth | 6-29-1970 | Race / Sex | W / M |
| Screening Officer / Badge # | Bradfield, Mb07 | Date | 12-30-2014 | Time | 2036 |

Was Prisoner a medical, mental health or suicide risk during any prior confinement? ☐ Yes  ☐ No   If Yes when: _____

## POLICE OFFICER'S OBSERVATIONS

Does the arresting or transporting officer believe that the inmate is a medical, mental health or suicide risk now? ☐ Yes   ☐ No

| Yes | No | | Yes | No | | Yes | No | |
|---|---|---|---|---|---|---|---|---|
| ☐ | ☑ | Assaultive /Violent Behavior | ☐ | ☑ | Hearing Voices/Seeing Visions | ☐ | ☑ | Passive |
| ☐ | ☑ | Loud/Obnoxious behavior | ☐ | ☑ | Appears Distracted | ☑ | ☐ | Intoxicated |
| ☐ | ☑ | Any Noticeable Marks/Scars | ☐ | ☑ | Observable Signs of Depression | ☐ | ☑ | Anxious/Scared |
| ☐ | ☑ | Bizarre Behavior | ☐ | ☑ | Crying/ Tearful | ☐ | ☑ | Incoherent |
| ☐ | ☑ | Alcohol/Drug Withdrawal | ☐ | ☑ | Confused | ☐ | ☑ | Verbally Threatening |
| ☐ | ☑ | Unusual Suspiciousness | ☐ | ☑ | Uncooperative | ☐ | ☑ | Embarrassed |
| ☐ | ☑ | Appears excessively worried about some situation other than the immediate legal problem. | | | | | | |
| ☐ | ☑ | Has made statements that there is nothing to look forward to in the immediate future (expressing helplessness or hopelessness?) | | | | | | |

If yes explain. _____

## MEDICAL HISTORY

| Yes | No | |
|---|---|---|
| ☐ | ☑ | Are you sick or injured?  If yes explain: _____ |
| ☐ | ☑ | Are you currently under a physician's care? If yes, explain: _____ |
| ☐ | ☐ | If female, are you pregnant? Month of Pregnancy: _____ |
| ☐ | ☑ | Are you currently taking any medication? If yes, list type(s), dosage(s), and frequency: _____ |
| ☐ | ☑ | Are you allergic to any medication(s)?  Type: _____ |
| ☐ | ☑ | Have you fainted recently or had a recent head injury? _____ |
| ☐ | ☑ | Have you been involved in a vehicle accident prior to arrest? _____ |

## DO YOU SUFFER FROM ANY OF THE FOLLOWING:

| Yes | No | | Yes | No | | Yes | No | |
|---|---|---|---|---|---|---|---|---|
| ☐ | ☑ | Blind/Hearing Impaired | ☐ | ☑ | Epilepsy, Seizures, Blackouts | ☐ | ☑ | Heart Disease |
| ☐ | ☑ | Artificial Limbs, castor splints | ☐ | ☑ | Other Medical Problems or Diseases | ☐ | ☑ | Chest Pains |
| ☐ | ☑ | Hepatitis | ☐ | ☑ | OC Sprayed / Tased | ☐ | ☑ | Asthma |
| ☐ | ☑ | Tuberculosis (TB) | ☐ | ☑ | Hospital returns | ☐ | ☑ | Venereal Disease |
| ☐ | ☑ | Shortness of Breath | ☐ | ☑ | Cancer | ☐ | ☑ | Diabetes |
| ☐ | ☑ | Abdominal Pain | ☐ | ☑ | Fresh Wounds | ☐ | ☑ | Drug Addiction |
| ☑ | ☐ | High Blood Pressure | ☐ | ☑ | Kidney Transplant | ☐ | ☑ | Ulcers |
| ☐ | ☑ | Alcohol Addiction | ☐ | ☑ | Trauma/ Bleeding | ☐ | ☑ | AIDS |

## SUICIDE ASSESSMENT

| Yes | No | |
|---|---|---|
| ☐ | ☑ | Have you ever attempted suicide? If yes, When? _____  Why? _____ How? _____ |
| ☐ | ☑ | Have you ever considered suicide? If yes, When? _____ Why? _____ |
| ☐ | ☑ | Are you now or have you ever been treated for mental health or emotional problems?  If yes, When? _____ Inpatient: _____ Outpatient: _____ Both: _____ |
| ☐ | ☑ | Have you recently experienced a significant loss job, relationship, death of family member/close friend, etc. If yes, explain: _____ |
| ☐ | ☑ | Are you thinking of a killing yourself? If yes, explain: _____ |

Additional Information: OFR#4 checked, MHMA _____

CTS-FRM-805                                                                 REVISION 2   01/14/15

77.   Without knowing anything about Mr. Fletcher, a reading of this Intake Screening Form would have you believe that he was completely fine medically but was just intoxicated with high blood pressure.

78.     However, as part of the investigation following the death of Hirschell Fletcher, Jr., Officer Bradfield wrote an affidavit stating that he did the book-in for Fletcher and at the time, Fletcher "had defecated on himself and was too intoxicated to comply with CDC rules."

79.     The Intake Screening Form states nothing that would give the reader the impression that Mr. Fletcher "had defecated on himself and was too intoxicated to comply with CDC rules."

80.     Additionally, Mr. Fletcher had been assaulted that night and blood and contusions from the beatings were patently visible on his head. Fletcher had requested medical attention for his head prior to arriving at the CDC.

81.     However, the Screening Intake Form actually has "no" checked for "Any noticeable marks/scars" and "no" checked for "Are you sick or injured?".

82.     It is clear Officer Bradfield did not get these answers from Mr. Fletcher, but simply marked "no" as the responses according to the City's *de facto* policy in the CDC.

83.     Similarly, in this case, Defendant Booker-Lewis marked "no" for all the answers to the questions for Juan during the book-in process despite the fact that Juan was unconscious and incapable of responding to questions. In a subsequent investigation, Defendant Booker-Lewis admitted that she did ask a couple of questions and Juan just made "grunting noises" in response.

84.     No where on Juan's Intake Screening Form did Defendant Booker-Lewis note that Juan was unconscious or incapable of responding to questions.

85.     Upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of arrestees being booked into the custody of the CDC who were unconscious, or otherwise incapable of responding

to questions, but CDC personnel marked "no" for their responses instead of summoning medical attention.

3. Physical dormitory checks must be conducted by two Detention Officers at the beginning and at the end of each control desk assignment.

86.     The City's policy is for CDC officers to conduct physical walk-through dorm checks of the inmates to confirm that each inmate is responsive and not unconscious or in need of immediate medical attention.

87.     However, the de facto policy is for these checks not to be routinely done or if they are done for the officers not to actually confirm responsiveness or consciousness, and to even ignore when inmates are unconscious, incoherent, and nonresponsive.

88.     Defendant Warren and Defendant Booker-Lewis fabricated completing these checks on Juan and simply did not do them when they claimed to have done them on their logs.

89.     Additionally, when Defendant Warren and Defendant Booker-Lewis did actually do the physical walk throughs, they did not even attempt to make physical contact with the inmates and simply walked by each inmate without confirming that they were conscious and responsive – such as Juan who was unconscious, had vomited, and had not moved for hours.

90.     Following the death of Hirschell Fletcher, Jr., Defendant Warren wrote a Declaration under penalty of perjury admitting, "During my walkthroughs, I did not wake the detainees unless there was good cause to do so."

91.     This was the custom and practice at the CDC and the *de facto* policy of the City which led to the death of Hirschell Fletcher, Jr. and Juan.

92.     Upon information and belief, discovery into information within the knowledge of the City will show that there are more instances of CDC personnel not performing walk through checks or performing the checks but not confirming that people were conscious or responsive pursuant to the City's *de facto* policy in the CDC.

**The Defendants' Deliberate Indifference
Toward Juan's Health and Safety Caused His Death**

93.     On June 30, 2019, Defendants Warren, Booker-Lewis, and Rumsey were working at the CDC and were responsible for the health and safety of the people under their custody and control.

94.     As a result of City policies, practices, and customs, Defendants Warren, Booker-Lewis, and Rumsey showed a callous cruelty toward Juan as he suffered helplessly under their watch, which resulted in his preventable death.

**The Need for Medical Care was Apparent When Juan Arrived at the CDC**

95.     That night, two unrelated individuals called 911 to report Juan being intoxicated to the point of falling to the ground and being unable to get up on his own.

96.     The calls were made two hours apart demonstrating that Juan's intoxication was not dissipating.

97.     The second time Juan fell, he did not get back up.

98.     As a result of both calls, Dallas Fire-Rescue (hereinafter referred to as "DFR") firetruck #8 responded.

99.     Defendant Maxwell Boeckel and Defendant Rodney Featherston were DFR paramedics on board DFR firetruck #8.

100.    According to Defendant Featherston, when Defendants Boeckel and Featherston responded to the first call of the night regarding Juan, they took Juan's vitals and called off the ambulance that was also responding.

101.    Following DFR firetruck #8 responding to the first call, Juan was able to stand up on his own and walk away.

102.    According to City policy, unlike responding ambulance personnel, if DFR personnel arrive in a firetruck, they are not required to document a person's vitals.

103.    Thus, although Defendant Featherston claims Juan's vitals were taken on the first call there is no documentation of what his vitals were at that time.

104.    DFR #8, including Defendant Boeckel and Defendant Featherston, responded to a second call of Juan falling roughly two hours later.

105.    When DFR #8 responded the second time that night and saw that it was Juan again, they called for Dallas Police Officers to respond.

106.    At that point, despite being unconscious, Juan was detained while waiting for officers to arrive.

107.    Defendant Beck and Defendant Brown were the Dallas Police Officers who responded.

108.    During their response to the second call of the night regarding Juan, neither Defendant Boeckel nor Defendant Featherston checked Juan's vitals or conducted a new examination of Juan.

109.    No DFR #8 paramedic checked Juan's vitals when responding to the second call.

110.    This time, Juan was not able to stand and walk away; and instead, Juan's body was limp and "dead weight."

111.    Defendant Boeckel and Defendant Featherston each chose not to re-examine Juan, and instead chose to rely on the information they had from their response to Juan two hours prior, which was no longer representative of Juan's condition.

112.    The decision not to check Juan's vitals or conduct a new examination on Juan shows that Defendants Boeckel and Featherston refused to treat him a second time that night and were engaging in conduct that would clearly evince a wanton disregard for Juan's serious medical needs as he was unconscious due to a second fall and his body was "dead weight."

113.    As a result of the City policy not requiring DFR #8 paramedics to document vitals, Juan's vitals were not taken during this second contact with DFR firetruck personnel, including Defendant Boeckel and Defendant Featherston.

114.    Defendants Boeckel and Featherston both simply made the decision Juan was intoxicated but cleared him of needing medical care or attention based off their previous contact with Juan that night and without actually providing a second round of medical care.

115.    Had Defendant Boeckel or Defendnat Featherston taken Juan's vitals during the second contact, they would have discovered that he needed medical care due to the brain bleed he was experiencing, which would have altered his blood pressure and pulse.

116.    However, Defendant Boeckel and Defendant Featherston provided no care to Juan during this second encounter, simply relying on information gathered at a prior encounter in the night which was not indicative of the condition Juan was in at the time.

117.    Defendant Beck and Defendant Brown then, with the help of DFR #8 personnel, lifted Juan's limp body and placed him into the back of Defendant Beck's police car.

118.    Defendant Beck took Juan to the CDC to book him on warrants he had for some outstanding tickets.

119.    Juan rode to the CDC in the back of Defendant Beck's police car, with his hands handcuffed behind his back as he laid face down on the seat, not moving the entire ride due to his extreme intoxication and unconsciousness.

120.    Defendant Beck had the authority to take Juan to the hospital instead of the CDC despite the clearance from the DFR #8 personnel; however, Defendant Beck made the choice to take Juan to the CDC knowing that Juan was unconscious, his body was limp and "dead weight," and he did not move the entire drive to the CDC.

121.    When Juan arrived at the jail, he showed obvious signs of dangerous intoxication as he had fallen twice that night in a matter of hours to the point that two random citizens felt the need to call the police, was incapable of walking or communicating, was unconscious, was incoherent, needed to be wheeled into the CDC in a wheelchair, and his body was "dead weight" to the point that his head was hanging straight back off of the wheelchair and needed to be held up during the book-in process.

122.    Both Defendant Beck and Defendant Brown were aware Juan's condition and all of the signs and symptoms listed in the preceding paragraph as they wheeled Juan's limp body into the CDC.

123.    Additionally, when Juan arrived at the jail, he showed obvious signs of a recent seizure, as one side of his body was rigid, and the other was not.

124.   Juan's left arm was stiff and locked onto the wheelchair, while his right arm was dangling as he was wheeled into the CDC to be booked into the facility.

125.   Both Defendant Beck and Defendant Brown had the authority to take Juan to the hospital instead of into the CDC and even to leave the CDC and take Juan to the hospital before he was booked in; however, both Defendant Beck and Defendant Brown chose not to do so despite being aware that Juan was extremely intoxicated, had fallen down twice, was unconscious, his body was limp and "dead weight" and he was non-responsive.

126.   The video footage from the back of Defendant Beck's police car and the CDC parking area both show Defendants Beck and Brown moving what appears to be a lifeless body – completely limp and "dead weight" and being moved around like a ragdoll. It was apparent that Juan needed medical attention – any high school kid at a party would have known that someone in Juan's condition needed 911 called immediately.

**Juan Should Have Received Medical Attention During Book-In at the CDC**

127.   Juan was booked into the CDC at 9:54 p,m. on June 30, 2019.

128.   Defendants Booker-Lewis and Rumsey were present when Juan was booked into the CDC.

129.   Defendants Booker-Lewis and Rumsey saw that Juan was incapable of walking or communicating, was unconscious, was incoherent, needed to be wheeled into the CDC in a wheelchair, and his body was "dead weight" to the point that his head was hanging straight back off of the wheelchair and needed to be held up during the book-in process.

130.   Defendant Rumsey was the On-Duty Supervisor at the CDC that night and was responsible for supervising Defendants Warren, Booker-Lewis, and Houston.

131.    According to City policy, the On-Duty Supervisor has the primary responsibility of ensuring the proper operations of the CDC.

132.    According to City policy, the On-Duty Supervisor – on this night, Defendant Rumsey – was responsible for ensuring that each prisoner was in acceptable physical and mental condition to be booked into the CDC at the discretion of the supervisor, either by personal contact on the book in floor or having the arrested person brought to the Sergeant's desk.

133.    Defendant Rumsey has personal contact with Juan during the book-in process and observed Juan's high level of intoxication, incoherence, and unconsciousness, and with the responsibility of ensuring the proper operation of the CDC, Defendant Rumsey approved Juan to be admitted as a prisoner in acceptable physical and mental condition under CDC standards.

134.    Defendant Rumsey was behind the counter in the book-in area and was responsible for reading Juan the reason he was being booked into the CDC.

135.    Juan's wheelchair was placed directly in front of Defendant Rumsey so that Defendant Rumsey could clearly see that Juan was unconscious and his body was limp in the wheelchair.

136.    Just before explaining everything to Juan, Defendant Ramsey sarcastically stated that he knew Juan was not going to remember what he told him and laughed.

137.    Defendant Ramsey was laughing at how intoxicated Juan was at the time.

138.    Defendant Rumsey asked Defendant Brown why Juan's arm was injured.

139.    Defendant Brown responded that he believed Juan had fallen.

140.    Thus, Defendant Rumsey was aware of facts showing that Juan was highly intoxicated, had fallen, was unconscious, and his body was limp in a wheelchair.

141.    Defendant Rumsey then asked Juan what his name was and received no response from Juan.

142.    Defendant Rumsey then asked Juan was his name was and claims he heard a "faint grunt."

143.    Defendant Rumsey then asked Juan what his date of birth was and claims he only heard Juan respond with a "faint grunt."

144.    Defendant Rumsey asked Defendants Beck and Brown if Juan was being charged with Public Intoxication or just being brought in on warrants for outstanding tickets.

145.    Defendants Beck and Brown told Defendant Rumsey that they were only bringing him in on the warrants.

146.    Defendant Rumsey asked Defendants Beck and Brown a second time if they were charging Juan with Public Intoxication because Defendant Rumsey "thought he was extremely intoxicated."

147.    As Defendant Rumsey attempted to talk with Juan, Juan did not and could not move, did not and could not speak, and did not and could not hold his head up.

148.    Defendant Booker-Lewis had to physically hold Juan's head up while Defendant Rumsey attempted to speak to him.

149.    When Defendant Booker-Lewis let go of Juan's head, it fell without any indication that Juan was able to hold it up on his own.

150.    Juan was dangerously intoxicated to the point often referred to as his body being like a "ragdoll" due to going completely limp.

151.   The fact that Juan's body was completely limp due to his dangerously high intoxication, highlighted the rigidity of his left arm – which is an obvious sign and symptom of a seizure.

152.   Both Defendant Booker-Lewis and Defendant Rumsey were aware that Juan's head was "dead weight" as Defendant Booker-Lewis physically held it up and watched it fall after she dropped it and Defendant Rumsey watched this happen as he attempted to speak to Juan.

153.   Defendant Brown was present during Defendant Rumsey's interaction with Juan and witnessed Defendant Rumsey laughing at Juan, witnessed Defendant Rumsey state that Juan would not remember what he said, witnessed Defendant Rumsey ask Juan questions and then Juan being non-responsive to those questions, and witnessed Defendant Booker-Lewis physically hold Juan's head up and watched it fall after she dropped it.

154.   Despite watching these things occur, Defendant Brown did not seek medical attention for Juan.

155.   Instead, Defendant Brown laughed at how intoxicated Juan was at the time.

156.   Despite knowledge of these facts, Defendant Rumsey as the Supervisor of the jail and acting pursuant to the City's policies and practices, admitted Juan into the CDC without any medical attention.

157.   Defendant Booker-Lewis completed the Medical Screening Form (hereinafter referred to as "MSF") for Juan during the book-in process.

158.   Defendant Booker-Lewis marked "no" for answers on Juan's MSF, despite not asking him questions or getting responses to questions that would indicate an answer of "no" should be marked on the MSF.

159.    Defendant Booker-Lewis could have marked that Juan was unable to answer, but instead made the conscious decision to mark "no" which would indicate to anyone reading the MSF afterward that Juan was coherent and actually responded to these questions in the negative.

160.    This was a common practice at the CDC – and the *de facto* policy – to mark "no" for answers on the MSF instead of indicating that the intoxicated person was unable to answer. This was done so that anyone reviewing the MSF on a later date would not see that the person was incoherent and/or unconscious and would believe they were not so intoxicated that they needed medical attention.

161.    On the MSF, Defendant Booker-Lewis noted that Juan as seen by DFR #8 and cleared.

162.    It was the City's policy at the CDC to use the DFR's decision regarding medical clearance at the scene in deciding whether a person was medically clear to enter the CDC.

163.    It did not matter how intoxicated someone was when they arrived at the jail – even someone like Juan, or the list of other people who have previously died in the CDC above, who was unconscious, incoherent, whose body was limp, and who had fallen like – as long as DFR cleared them at some point earlier in the night then they would be accepted into the CDC and placed in a holding cell.

164.    During a subsequent investigation, Defendant Booker-Lewis admitted that she did ask a couple of questions and Juan just made "grunting noises" in response.

165.    Under the "Officer Observations" section of Juan's MSF, Defendant Booker-Lewis marked "yes" for intoxicated.

166.   Under the "Officer Observations" section of Juan's MSF, Defendant Booker-Lewis marked "yes" for incoherent.

167.   Under the "Officer Observations" section of Juan's MSF, Defendant Booker-Lewis marked "no" for confused.

168.   Defendant Booker-Lewis indicating that Juan was not confused was a gross mischaracterization of his situation, as he was unconscious and unable to hold his own head up or respond to questions. While Juan did not give answers indicating that he was confused, his inability to answer questions at all indicated he was at risk of serious harm and was in need of immediate medical attention.

169.   It was common practice to admit dangerously intoxicated persons into the CDC without giving them medical attention despite their obvious signs and symptoms necessitating a requirement for immediate medical care.

170.   This common practice is indicated by the ten previous deaths in the CDC listed above and the incident with Mr. Nascimento above, who thankfully did not die.

171.   Upon information and belief, discovery into information within the knowledge of the City will show that there are more many instances where dangerously intoxicated people were admitted into the CDC despite their obvious signs and symptoms necessitating a requirement for immediate medical care.

**Juan Should have Received Medical Attention When Abandoned in a Cell**

172.   Juan was left to suffer and deteriorate in a cell at 10:13 p.m.

173.   Defendant Booker-Lewis wheeled Juan in his wheelchair to the elevator and up to the second floor where he would be housed.

174.    Juan's condition did not improve during this transport to the second floor and it was clear and obvious that he needed medical attention due to his body being limp, he being unconscious and incoherent, and his left arm being stiff.

175.    When Defendant Booker-Lewis arrived upstairs with Juan in the wheelchair, Defendant Warren was already upstairs.

176.    Defendant Warren was assigned to the control desk at the time and according to City policy was the sole officer with responsibility to "monitor all prisoners' activities."

177.    When Defendant Warren saw Juan, Juan was in obvious need of immediate medical attention as he was in a wheelchair, his body was limp, he was unconscious and incoherent, and his left arm was stiff.

178.    Additionally, during a subsequent investigation, Defendant Warren stated that when she first saw Juan on the second floor of the CDC, Juan was very intoxicated and was shaking as if he was cold.

179.    However, according to the City's unlawful, unconstitutional, and deliberately indifferent policies and practices at the CDC, Juan's condition did not necessitate Defendant Warren seeking medical attention for Juan.

180.    Instead, Defendant Warren and Defendant Booker-Lewis wheeled Juan into a holding cell.

181.    Once inside of the cell, Defendant Warren and Defendant Booker-Lewis attempted to get Juan out of the wheelchair, but due to his dangerous intoxication level, Juan could not get up.

182.    As a result, Defendant Warren and Defendant Booker-Lewis literally lifted Juan out of the chair and dropped him onto the mat in the cell.

183.    The video of Defendant Warren and Defendant Booker-Lewis dropping Juan's limp body to the ground would be enough to enrage any jury at the complete disregard for human life Defendants Warren and Booker-Lewis showed as they acted pursuant to the City's unconstitutional policies and practices in the CDC.

184.    If fraternity brothers at a party dumped a drunk pledge in Juan's condition in a back room where no medical attention would be provided until he died, they would be criminally charged in that death. However, because the culprits here were officers and jailers, no criminal charges were brought, despite the same abhorrent conduct.

### Juan Should have Received Medical Attention as He Suffered All Night

185.    Defendant Warren was the sole officer at the control desk and on the second floor from 10:13 p.m. on June 30, 2019 to 1:15 a.m. on July 1, 2019.

186.    This demonstrates the City's practice and custom at the CDC of having only one officer available for checks, which meant that the officer would not be going into the cells but would only be doing checks through the tiny windows of the cell doors – if they even actually went to the doors for each check.

187.    Defendant Warren was supposed to check on each person housed in the holding cells every fifteen minutes to ensure they did not need medical attention.

188.    However, the *de facto* policy at the CDC was not to do these checks as required, but instead to simply make it appear that these checks were being done.

189.    The City maintained a policy of using an electronic system to conduct these checks so that the officers would be required to leave the control desk and be physically present at each cell door.

190.    Upon information and belief, the City's policymakers, the city council, approved and instituted this electronic system due to issues with the officers failing to

leave the control desk to make these checks, instead just watching the cells on the video surveillance at the desk.

191.    Thus, the City's policymakers were aware that if the electronic system was not functioning, the officers would revert to the practice and custom of failing to leave the control desk to make these checks, instead just watching the cells on the video surveillance at the desk, which would increase the risk to the inmates' health and safety because this was not a sufficient way to adequately monitor the intoxicated people being held in cells in the CDC.

192.    The City's policymakers were aware that this was not a sufficient way to adequately monitor the intoxicated people being held in cells in the CDC and that this would lead to constitutional violations of failure to provide adequate medical care to the inmates because of the above referenced deaths and the other incidents similar to those deaths and to the incident with Mr. Nascimento which discovery into information within the knowledge of the City will reveal.

193.    Upon information and belief, discovery into information within the knowledge of the City will show that the electronic monitoring system was not functioning due to the City policymakers making the decision not to continue maintaining administrative procedures of keeping the system running – such as choosing not to update the system, choosing not to register the system, or choosing not to pay for the system – and that the reason for the electronic system not functioning at this time was not due to some sort of equipment failure.

194.    Accordingly, the City policymakers were on notice that the electronic system was not functioning and made the conscious decision to move forward with manual cell check documentation despite knowing that this would lead to officers not adequately

monitoring the cells, and, in turn, not providing adequate medical care to inmates, such as Juan.

195.   Defendant Warren only completed roughly ¼ to 1/3 of the checks she was supposed to complete while Juan was in the CDC.

196.   Defendant Warren fabricated the remaining checks on the log she kept.

197.   Defendant Warren documented that she performed checks at 10:30 p.m., 10:45 p.m., 11:15 p.m., 11:45 p.m., 12:00 a.m., and 12:45 a.m.; however, Defendant Warren did not perform these checks.

198.   Defendant Warren was supposed to physically go into the cell once every hour to wake the inmates to make sure they were not unconscious.

199.   Defendant Warren documented that she performed an in-cell check at 11:00 p.m.; however, she did not go into Juan's cell at that time.

200.   Instead, Defendant Houston entered the cell at 11:00 a.m. and saw that Juan was unconscious on the ground.

201.   During this cell check at 11:00 p.m. on July 1, 2019, Juan had his arm on the wall. After Defendant Houston walked out of the cell, Juan's arm fell and he stopped moving for the remainder of the night.

202.   Defendant Warren documented that she performed an in-cell check at 12:00 a.m.; however, Defendant Warren did not enter the cell or even walk over to the door of the cell at this time.

203.   Defendant Warren's failure to actually perform her cell checks is documented on video surveillance which shows Defendant Warren fail to even get up from the control desk when she alleged to have made checks.

204.   No officer performed an in-cell check on Juan's cell at 12:00 a.m.

205.   It had now been an hour since Juan stopped moving.

206.   While Defendant Warren was the sole officer responsible for monitoring all prisoners' activities, while unconscious and dangerously intoxicated on his cell floor, Juan began vomiting.

207.   The vomit cannot be seen on the video that the Defendants could see of Juan's cell while they sat at the Control Desk.

208.   The video of Juan's cell that could be seen by the Defendants at the Control Desk was of such a poor quality that all they could basically see was where the inmates were in the cell.

209.   It was impossible to see if an inmate was conscious, had vomited, was in distress, was breathing, or was even alive just by viewing the video from the Control Desk.

210.   Additionally, unless an inmate was moving around and talking, it was impossible to see if an inmate was conscious, was in distress, was breathing, or was even alive just by looking through the small window in the door.

211.   The only way to confirm these things was to actually enter the cell and attempt to wake each of the inmates.

212.   Pursuant to the City's policies, officers were only required to enter the cells once every hour.

213.   However, the practice and custom at the CDC – which was the *de facto* policy – was for the officers not to perform these in-cell checks every hour.

214.   One of the reasons is because per the City policy, only one officer is stationed on the second floor per shift. Also, per City policy, at least two officers are required to perform an in-cell check so that one can remain at the door while the other goes into the

cell. Thus, if another officer does not come upstairs to help the second floor officer, then the in-cell check will not occur.

215.    This is precisely what happened with Juan's cell checks.

216.    At 12:56 a.m., Defendant Warren noticed the vomit next Juan as he laid motionless on the floor of his cell; however, she did nothing to provide him medical attention and told no one.

217.    Defendant Warren did not touch Juan or attempt to physically awaken him.

218.    Defendant Warren left the cell and did not call 911 or alert anyone else to Juan's obvious need for medical care.

219.    During a subsequent investigation, Defendant Warren stated that every time she looked, Juan was still shaking.

220.    This shaking cannot be seen on the video footage of Juan's cell and no other officers noted this shaking; however, if Juan was shaking from the time that Defendant Warren saw Juan until the last time she saw him, this means that Juan would have been shaking from 10:13 p.m. until 5:05 p.m. – roughly seven hours. Despite this prolonged shaking, Defendant Warren did not seek or provide medical attention for Juan.

221.    At 1:15 a.m. on July 1, 2019, Defendant Booker-Lewis took over for Defendant Warren as the sole officer at the control desk and on the second floor responsible for monitoring all prisoners' activities.

222.    Defendant Booker-Lewis was in this position at the control desk from 1:15 a.m. to 3:30 a.m.

223.    This demonstrates the City's practice and custom at the CDC of having only one officer available for checks, which meant that the officer would not be going into the

cells but would only be doing checks through the tiny windows of the cell doors – if they even actually went to the doors for each check.

224.   Defendant Booker-Lewis, following the practice and custom not to actually perform all of her required checks, wrote down her checks from 1:15 a.m. to 3:30 a.m. when she arrived at the control desk at 1:15 a.m.

225.   At 1:56 a.m., Defendant Booker-Lewis entered the cell to provide the inmates with snacks.

226.   Defendant Booker-Lewis dropped a snack next to Juan's head, notices that he is unconscious, does not even attempt to physically wake him, and leaves the cell.

227.   Defendant Booker-Lewis did not did not call 911 or alert anyone else to Juan's obvious need for medical care.

228.   Defendant Booker-Lewis physically left the building at 3:21 a.m. on July 1, 2019, despite already marking down that she performed a check at 3:30 a.m. (9 minutes after she had already left).

229.   Defendant Booker-Lewis never made note of the vomit on the floor next to Juan, which was a foreseeable consequence of not entering Juan's cell to check on him and not her other cell checks.

230.   Defendant Booker-Lewis did not call 911 or alert anyone else to Juan's obvious need for medical care at any point.

231.   At 3:20 a.m., Defendant Houston took over for Defendant Booker-Lewis as the sole officer at the control desk and on the second floor responsible for monitoring all prisoners' activities.

232.   Defendant Houston was in this position at the control desk from 3:20 a.m. to 5:45 a.m.

233.    This demonstrates the City's practice and custom at the CDC of having only one officer available for checks, which meant that the officer would not be going into the cells but would only be doing checks through the tiny windows of the cell doors – if they even actually went to the doors for each check.

234.    At 3:17 a.m., Defendant Houston entered the cell for an in-cell check and actually attempted to wake Juan; however, he was unable to do so.

235.    Defendant Houston did not call 911 or provide any other medical attention for Juan.

236.    Instead, Defendant Houston called Defendant Rumsey and voiced his concerns about Juan.

237.    Defendant Houston did not alert Defendant Rumsey regarding his concerns for Juan until almost an hour and a half later.

238.    At 4:57 a.m., in response to Defendant Houston's concerns, Defendant Rumsey went to Juan's cell to do a check.

239.    When Defendant Rumsey entered the cell, he saw Juan was unconscious on the floor and had vomited.

240.    Defendant Rumsey attempted to wake Juan; however, Juan would not wake up.

241.    However, Defendant Rumsey simply left the cell without providing medical care or attention.

242.    Defendant Rumsey did not call 911 or alert anyone else to Juan's obvious need for medical care.

243.    Defendant Houston also did not call 911 or alert anyone other than Defendant Rumsey about Juan's obvious need for medical care.

244. Defendant Houston could have called 911 but chose to do nothing to help Juan after seeing Defendant Rumsey do nothing.

245. At 5:05 a.m., eight minutes after Defendant Houston and Defendant Rumsey's check of Juan, Defendant Houston returned to Juan's cell with Defendant Warren and Defendant Booker-Lewis. They each looked at Juan, and Warren said, "Damn" in response to seeing Juan unconscious with vomit on his mat.

246. Defendant Houston, Defendant Warren, and Defendant Booker-Lewis each left the cell without providing medical attention to Juan.

247. Defendant Houston, Defendant Warren, and Defendant Booker-Lewis all chose not to call for medical attention for Juan or to alert anyone else who could get medical attention for Juan.

248. Over an hour later at the 6:00 a.m. shift change, Defendant Rumsey finally told someone else about Juan's condition.

249. Defendant Rumsey told Sergeant Cortez, the next supervisor coming onto shift, about Juan being unconscious and that they might want to check on him.

250. In a subsequent investigation, Defendant Rumsey stated in reference to seeing Juan at 4:57 a.m., "I thought he should be more awake by now."

251. Defendant Rumsey knew that Juan was unconscious, limp, and had fallen from what Defendant Brown told him when he was booked into the CDC at 9:54 p.m. the previous night and was still unconscious on the ground over seven hours later at 4:57 a.m. Only now, Defendant Rumsey was aware that Juan had also vomited.

252. Despite this information, Defendant Rumsey did not call for medical attention for Juan.

253.    Instead, Defendant Rumsey waited over an hour until his shift was over and he told the oncoming Supervisor he might want to check on Juan, who had then been unconscious at the CDC for over eight hours.

254.    Defendant Rumsey is directly responsible for Juan's death.

255.    Sgt. Cortez had one of the officers check on Juan.

256.    The officer was unable to wake Juan up, so they called 911.

257.    DFR personnel arrived at 6:14 a.m.

258.    Juan was taken to the hospital where it was determined that he had a closed head injury, likely from the repeated falls he took the previous night during his dangerously high level of intoxication which resulted in two 911 calls and his public intoxication arrest.

259.    Surgery was done at the hospital to relieve the bleeding on Juan's brain; however, the bleeding had been allowed to go untreated all night as a result of the Defendants in this case refusing to provide medical care to a person who was in obvious and apparent need of care.

260.    In instances such as this, it would have been important to assess and treat Juan as close to the time of injury as possible. This treatment could have reduced the pain and suffering from the injuries as well as well as lead to successful surgery, which could have saved Juan's life.

261.    The extended delay in treatment caused Juan to deteriorate to the point that medical intervention could not be successful.

262.    Had the City's policy required DFR to take and document vitals like a responding ambulance would have had to do, Juan's life could have been saved.

263.    Had Juan been provided medical care and attention when he was obviously in need at the time of book-in at the CDC, his life could have been saved.

264.    Had Juan been provided medical care and attention when he was obviously in need at the time he was thrown onto the mat in the cell, his life could have been saved.

265.    Had Juan been provided medical care and attention when he was obviously in need at the time he was unconscious, not moving, and vomiting on the floor of his cell, his life could have been saved.

266.    The unnecessarily extended delay of medical care at the CDC resulted in Juan's undue suffering and preventable death.

267.    The Defendants were at all times acting under the color of law.

**IV.**
**Causes of Action**

**COUNT I**

**DELIBERATE INDIFFERENCE TO MEDICAL NEEDS**
**Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983**
**Defendants Warren, Booker-Lewis, Rumsey, Houston, Beck, Brown,**
**Boeckel, and Featherston**

268.    Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

269.    Pretrial Detainees must rely on jail authorities to treat their medical needs; therefore, the government has an obligation to provide medical care for those whom it is incarcerating.

270.    Juan Segovia had a constitutional right to medical care while incarcerated as a pretrial detainee under the 14th amendment.

271.   Episodic acts or omissions occur where the complained-of harm is a particular act or omission of one or more officials. *Hare v. City of Corinth, Miss.*, 74 F.3d 633, 645 (5th Cir. 1996).

272.   "The Fourteenth Amendment guarantees pretrial detainees a right 'not to have their serious medical needs met with deliberate indifference on the part of the confining officials.'" *Dyer v. Houston*, 964 F.3d 374, 380 (5th Cir. 2020) (quoting *Thompson v. Upshur Cnty., Tex.*, 245 F.3d 447, 457 (5th Cir. 2001)).

273.   "A government official violates a Fourteenth Amendment right when the official acts with deliberate indifference to a detainee's serious medical needs." *Est. of Bonilla by & through Bonilla v. Orange Cnty., Tex.*, 982 F.3d 298, 305 (5th Cir. 2020).

274.   As to the individual in an episodic-acts-or-omissions claim, the relevant question becomes "whether that official breached his constitutional duty to tend to the basic human needs of persons in his charge…" *Est. of Henson v. Wichita Cty., Tex.*, 795 F.3d 456, 463–64 (5th Cir. 2015).

275.   <u>A serious medical condition or need</u> is "one for which treatment has been recommended or for which <u>the need is so apparent that even laymen would recognize that care is required</u>." (emphasis added) *Carlucci v. Chapa*, 884 F.3d 534, 538-40 (5th Cir. 2018) (quoting *Gobert v. Caldwell*, 463 F.3d 339, 345 n.12 (5th Cir. 2006))

276.   "To succeed on a deliberate-indifference claim, plaintiffs must show that (1) the official was 'aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' and (2) the official actually drew that inference." Dyer, 964 F.3d at 380 (quoting *Domino v. Tex. Dep't of Criminal Justice*, 239 F.3d 752, 755 (5th Cir. 2001)).

277.   "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

278.   "[T]he plaintiff must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for serious medical needs." *Domino*, 239 F.3d at 756.

279.   "A prison guard is deliberately indifferent if he intentionally denies or delays access to medical care." *Estelle v. Gamble*, 429 U.S. 97, 103 (1976).

280.   An official's actual knowledge of a substantial risk may only be inferred if the "substantial risk" was obvious. *Easter v. Powell*, 467 F.3d 459, 463 (5th Cir. 2006).

281.   Moreover, deliberate indifference cannot be inferred from "negligent or even a grossly negligent response to a substantial risk of serious harm." *Thompson v. Upshur Cty.*, 245 F.3d 447, 458-59 (5th Cir. 2001).

282.   The Fifth Circuit previously held that a defendant's failure to call an ambulance for almost two hours while plaintiff lay unconscious and vomiting rises to the level of deliberate indifference. *Austin v. Johnson*, 328 F.3d 204, 210 (5th Cir. 2003).

283.   Since *Estelle v. Gamble*, 429 U.S. 97, 104 (1976), state officers have been on notice that deliberate indifference to a prisoner's serious medical needs violates the Constitution. *Austin*, 328 F.3d at 210.

284.   Juan Segovia "had a clearly established right 'not to have [his] serious medical needs met with deliberate indifference on the part of the confining officials.'"

46

*Bonilla*, 982 F.3d at 307 (quoting *Dyer*, 964 F.3d at 380); see also *Thompson*, 245 F.3d at 457.

285.   At the time Defendants Warren, Booker-Lewis, and Rumsey denied Juan Segovia treatment, the law was clearly established that a prison inmate could demonstrate a constitutional violation by showing that a prison official "'refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs.'" *Easter*, 467 F.3d at 465 (quoting *Domino*, 239 F.3d at 756).

286.   The Fifth Circuit has affirmed a jury's findings in a similar case that the defendant officers were not merely negligent, and instead their conduct rose to the level of a constitutional violation. *Fielder v. Bosshard*, 590 F.2d 105 (5th Cir. 1979). On July 2, 1976, Jimmie Fielder was arrested by appellants Walker and Chandler for failure to make child support payments. *Id.* at 107. They were told that Fielder was sick and under medication. *Id.* He was taken to the Williamson County Jail where Robert Champion, the jailer, was informed by Fielder's mother that Fielder was sick, that he had a virus and high blood pressure, that he had not eaten, and that he needed attention. *Id.* At noon on July 4, 1976, Fielder's behavior became bizarre. *Id.* at 108. At 9:00 P.M. on July 4, Champion called the sheriff's office to inform them of Fielder's condition, and then Deputies Chandler and Walker went to the jail where the three men escorted Fielder to a cell on the second floor. *Id.* Fielder was irrational, afraid, mumbling incoherently, and waving his arms. *Id.* The jailer and the two deputies maintained that he was faking, and Deputy Walker later stated in his report to Sheriff Bosshard that Fielder was just "putting on." *Id.* Champion checked on Fielder two more times that day, but Fielder showed no improvement. *Id.* At 7:00 a.m. on July 5, Champion looked into Fielder's cell and saw

Fielder was lying quiet on the bare floor. *Id*. Without first checking on Fielder, Champion reported to Bosshard, who advised him to do so. *Id*. Jimmie Fielder was dead. *Id*.

287.   The Fifth Circuit affirmed the jury's finding that the jailers had "crossed the line between misfeasance and conscious cruelty." *Id*. The Fifth Circuit went on to proclaim that "[t]here is a vast difference between an earnest, albeit unsuccessful attempt to care for a prisoner and a cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help." *Id*.

### Defendant Warren was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

288.   Defendants Warren was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Juan was extremely intoxicated, upon entry to the CDC he had blood on his arm, had to be wheeled in by a wheelchair because he was unable to walk, his body was limp like a ragdoll, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, Defendant Warren and Defendant Booker-Lewis had to physically dump Juan out of the wheelchair onto the floor in the cell, he did not regain consciousness the entire night as he laid in his cell, he vomited on the floor in the cell, Defendant Warren claims Juan was shaking from the moment she saw him upon entry into the jail and did not stop shaking the entire night, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care.

289.   Thus, Defendant Warren was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**<u>Defendant Warren actually drew that inference.</u>**

290.   Defendant Warren actually drew this inference because she and Defendant Booker-Lewis had to physically dump Juan onto the ground when he was incapable of getting out of the wheelchair on his own due to being unconscious, Defendant Warren acknowledged after the fact that she saw he was shaking all night, Defendant Warren saw that Juan was unconscious the entire night, Defendant Warren saw that Juan had vomited while he laid on the floor unconscious, and when Defendant Warren looked at Juan at 5:08 a.m. on July 1, 2019, she stated, "Damn!" in response to his condition.

291.   Further, Defendant Warren's actual knowledge of the substantial risk can be inferred because it was so obvious and <u>the need was so apparent that even laymen would recognize that care is required</u> – as Juan was extremely intoxicated, upon entry to the CDC he had blood on his arm, had to be wheeled in by a wheelchair because he was unable to walk, his body was limp like a ragdoll, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, Defendant Warren and Defendant Booker-Lewis had to physically dump Juan out of the wheelchair onto the floor in the cell, he did not regain consciousness the entire night as he laid in his cell, he vomited on the floor in the cell, Defendant Warren claims Juan was shaking from the moment she saw him upon entry into the jail and did not stop shaking the entire night, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Warren actually drew the inference that a substantial risk of serious harm existed.

292.   Accordingly, Defendant Warren was deliberately indifferent to Juan because Defendant Warren "refused to treat him … or engaged in any similar conduct that

49

would clearly evince a wanton disregard for any serious medical needs" when she lied about doing checks but did not actually do these checks even though she was aware that Juan was in a dire condition and by not providing medical care or summoning medical care for Juan when she was aware of his dire condition. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

**Defendant Booker-Lewis was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

293.    Defendants Booker-Lewis was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Juan was extremely intoxicated, upon entry to the CDC Juan had to be wheeled in by a wheelchair because he was unable to walk, his body was limp like a ragdoll, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, Juan was incapable of responding to Defendant Booker-Lewis's questions during book-in, Defendant Booker-Lewis physically held up Juan's head when Defendant Rumsey was attempting to speak to him during book-in and then when she let go of his head it immediately fell limp, Defendant Booker-Lewis and Defendant Warren had to physically dump Juan out of the wheelchair onto the floor in the cell, he did not regain consciousness the entire night as he laid in his cell, he vomited on the floor in the cell, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care.

294.    Thus, Defendant Booker-Lewis was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### Defendant Booker-Lewis actually drew that inference.

295.    Defendant Booker-Lewis actually drew this inference because she saw that he could not hold his own head up during book-in and held it up for him then watched it fall limp when she let go, heard him only make a grunting noise in response to questions during book-in but then fabricated that he stated "no" to all of the responses she marked on the MSF, marked that Juan was intoxicated and incoherent on the medical screening form, she and Defendant Warren had to physically dump Juan onto the ground when he was incapable of getting out of the wheelchair on his own due to being unconscious, Defendant Booker-Lewis saw that Juan was unconscious the entire night, and Defendant Booker-Lewis saw that Juan had vomited while he laid on the floor unconscious. Further, Defendant Booker-Lewis' actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as Juan was extremely intoxicated, upon entry to the CDC Juan had to be wheeled in by a wheelchair because he was unable to walk, his body was limp like a ragdoll, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, Juan was incapable of responding to Defendant Booker-Lewis's questions during book-in, Defendant Booker-Lewis physically held up Juan's head when Defendant Rumsey was attempting to speak to him during book-in and then when she let go of his head it immediately fell limp, Defendant Booker-Lewis and Defendant Warren had to physically dump Juan out of the wheelchair onto the floor in the cell, he did not regain consciousness the entire night as he laid in his cell, he vomited on the floor in the cell, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345.

Thus, Defendant Booker-Lewis actually drew the inference that a substantial risk of serious harm existed.

296.   Accordingly, Defendant Booker-Lewis was deliberately indifferent to Juan because Defendant Booker-Lewis "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" when she lied about doing checks but did not actually do these checks even though she was aware that Juan was in a dire condition and by not providing medical care or summoning medical care for Juan when she was aware of his dire condition. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

### Defendant Rumsey was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

297.   Defendants Rumsey was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Juan was extremely intoxicated, had to be wheeled in by a wheelchair because he was unable to walk, his body was limp like a ragdoll, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, Defendant Ramsey sarcastically stated that he knew Juan was not going to remember what he told him and laughed, Defendant Ramsey was laughing at how intoxicated Juan was at the time, Defendant Rumsey asked Defendant Brown why Juan's arm was injured and Defendant Brown responded that he believed Juan had fallen, Defendant Rumsey was aware of facts showing that Juan was highly intoxicated, had fallen, was unconscious, and his body was limp in a wheelchair, Defendant Rumsey then asked Juan what his name was and received no response from Juan, Defendant Rumsey then asked Juan was his name was and claims he heard a "faint grunt," Defendant Rumsey then asked Juan what his date of birth was and claims he only

heard Juan respond with a "faint grunt," Defendant Rumsey asked Defendants Beck and Brown two times if they were charging Juan with Public Intoxication because Defendant Rumsey "thought he was extremely intoxicated," as Defendant Rumsey attempted to talk with Juan, Juan did not and could not move, did not and could not speak, and did not and could not hold his head up, Defendant Booker-Lewis had to physically hold Juan's head up while Defendant Rumsey attempted to speak to him, when Defendant Booker-Lewis let go of Juan's head, it fell without any indication that Juan was able to hold it up on his own, Defendant Rumsey saw that Juan was dangerously intoxicated to the point often referred to as his body being like a "ragdoll" due to going completely limp, Defendant Houston voiced his concerns to Defendant Rumsey regarding Juan's medical condition, Defendant Rumsey did a check on Juan at 4:57 a.m. and saw that Juan was still unconscious and had vomited, Defendant Rumsey knew that Juan was unconscious, limp, and had fallen from what Defendant Brown told him when he was booked into the CDC at 9:54 p.m. the previous night and was still unconscious on the ground over seven hours later at 4:57 a.m., despite this information, Defendant Rumsey did not call for medical attention for Juan, Defendant Rumsey waited over an hour until his shift was over and he told the oncoming Supervisor he might want to check on Juan, who had then been unconscious at the CDC for over eight hours, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care.

298.   Thus, Defendant Rumsey was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### Defendant Rumsey actually drew that inference.

299.   Defendant Rumsey actually drew this inference because he saw that Juan was extremely intoxicated, had to be wheeled in by a wheelchair because he was unable to walk, his body was limp like a ragdoll, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, and then Defendant Rumsey sarcastically stated that he knew Juan was not going to remember what he told him and laughed, Defendant Ramsey was laughing at how intoxicated Juan was at the time, Defendant Rumsey asked Defendant Brown why Juan's arm was injured and Defendant Brown responded that he believed Juan had fallen, Defendant Rumsey was aware of facts showing that Juan was highly intoxicated, had fallen, was unconscious, and his body was limp in a wheelchair, Defendant Rumsey then asked Juan what his name was and received no response from Juan, Defendant Rumsey then asked Juan was his name was and claims he heard a "faint grunt," Defendant Rumsey then asked Juan what his date of birth was and claims he only heard Juan respond with a "faint grunt," Defendant Rumsey asked Defendants Beck and Brown two times if they were charging Juan with Public Intoxication because Defendant Rumsey "thought he was extremely intoxicated," as Defendant Rumsey attempted to talk with Juan, Juan did not and could not move, did not and could not speak, and did not and could not hold his head up, Defendant Booker-Lewis had to physically hold Juan's head up while Defendant Rumsey attempted to speak to him, when Defendant Booker-Lewis let go of Juan's head, it fell without any indication that Juan was able to hold it up on his own, Defendant Rumsey saw that Juan was dangerously intoxicated to the point often referred to as his body being like a "ragdoll" due to going completely limp, Defendant Houston voiced his concerns to Defendant Rumsey regarding Juan's medical condition, Defendant Rumsey did a check on Juan at

4:57 a.m. and saw that Juan was still unconscious and had vomited, Defendant Rumsey knew that Juan was unconscious, limp, and had fallen from what Defendant Brown told him when he was booked into the CDC at 9:54 p.m. the previous night and was still unconscious on the ground over seven hours later at 4:57 a.m., despite this information, Defendant Rumsey did not call for medical attention for Juan, Defendant Rumsey waited over an hour until his shift was over and he told the oncoming Supervisor he might want to check on Juan, who had then been unconscious at the CDC for over eight hours, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care.

300.   Further, Defendant Rumsey's actually knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as he saw that Juan was extremely intoxicated, had to be wheeled in by a wheelchair because he was unable to walk, his body was limp like a ragdoll, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, and then Defendant Rumsey Defendant Rumsey sarcastically stated that he knew Juan was not going to remember what he told him and laughed, Defendant Ramsey was laughing at how intoxicated Juan was at the time, Defendant Rumsey asked Defendant Brown why Juan's arm was injured and the Defendant Brown responded that he believed Juan had fallen, Defendant Rumsey was aware of facts showing that Juan was highly intoxicated, had fallen, was unconscious, and his body was limp in a wheelchair, Defendant Rumsey then asked Juan what his name was and received no response from Juan, Defendant Rumsey then asked Juan was his name was and claims he heard a "faint grunt," Defendant Rumsey then asked Juan what his date of birth was and claims he only heard Juan respond with a "faint grunt,"

Defendant Rumsey asked Defendants Beck and Brown two times if they were charging Juan with Public Intoxication because Defendant Rumsey "thought he was extremely intoxicated," as Defendant Rumsey attempted to talk with Juan, Juan did not and could not move, did not and could not speak, and did not and could not hold his head up, Defendant Booker-Lewis had to physically hold Juan's head up while Defendant Rumsey attempted to speak to him, when Defendant Booker-Lewis let go of Juan's head, it fell without any indication that Juan was able to hold it up on his own, Defendant Rumsey saw that Juan was dangerously intoxicated to the point often referred to as his body being like a "ragdoll" due to going completely limp, Defendant Houston voiced his concerns to Defendant Rumsey regarding Juan's medical condition, Defendant Rumsey did a check on Juan at 4:57 a.m. and saw that Juan was still unconscious and had vomited, Defendant Rumsey knew that Juan was unconscious, limp, and had fallen from what Defendant Brown told him when he was booked into the CDC at 9:54 p.m. the previous night and was still unconscious on the ground over seven hours later at 4:57 a.m., despite this information, Defendant Rumsey did not call for medical attention for Juan, Defendant Rumsey waited over an hour until his shift was over and he told the oncoming Supervisor he might want to check on Juan, who had then been unconscious at the CDC for over eight hours, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Rumsey actually drew the inference that a substantial risk of serious harm existed.

301.   Accordingly, Defendant Rumsey was deliberately indifferent to Juan Segovia because Defendant Rumsey "refused to treat him … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by

not providing medical care or summoning medical care for Juan when he was aware of his dire condition both during the book-in process, when Defendant Houston voiced his concerns to Defendant Rumsey, and after Defendant Rumsey went to check on Juan himself at 4:57 a.m. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

**Defendant Houston was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

302.   Defendant Houston was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Juan was extremely intoxicated, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, he did not regain consciousness the entire night as he laid in his cell, he vomited on the floor in the cell, he would not wake up despite Defendant Houston physically attempting to wake him, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care.

303.   Thus, Defendant Houston was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**Defendant Houston actually drew that inference.**

304.   Defendant Houston actually drew this inference because saw that Juan was unconscious the entire night and that Juan had vomited while he laid on the floor unconscious, attempted to physically wake Juan but could not, voiced his concerns to Defendant Rumsey, and did an unscheduled in-cell check with Defendant Rumsey after voicing his concerns to Defendant Rumsey.

305.   Further, Defendant Houston's actual knowledge of the substantial risk can be inferred because it was so obvious and <u>the need was so apparent that even laymen</u>

would recognize that care is required – as Defendant Houston was aware that Juan was extremely intoxicated, he was incapable of standing and his body was "dead weight," he was unconscious, he was incoherent, he did not regain consciousness the entire night as he laid in his cell, he vomited on the floor in the cell, he would not wake up despite Defendant Houston physically attempting to wake him, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care.. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Houston actually drew the inference that a substantial risk of serious harm existed.

306.    Accordingly, Defendant Houston was deliberately indifferent to Juan because Defendant Houston "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Juan when he was aware of his dire condition both prior to alerting Defendant Rumsey of his concerns and after alerting Defendant Rumsey and being aware that Defendant Rumsey was not requesting medical attention for Juan. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

**Defendant Beck was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

307.    Defendant Beck was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Juan was extremely intoxicated, unconscious, and "dead weight" when Defendant Beck first made contact with Juan, Defendant Beck and Defendant Brown had to physically lift, carry, and place Juan into the back of Defendant Beck's patrol vehicle due to Juan being unconscious, Defendant Beck saw that as Juan rode to the CDC in the back of Defendant Beck's patrol

vehicle he was unconscious the entire time, was not moving, and was lying faced own on the seat, Defendant Beck and Defendant Brown had to physically lift Juan out of Defendant Beck's patrol vehicle and place him in a wheelchair because Juan was unconscious, his body was limp like a ragdoll, and he was "dead weight," Defendant Beck and Defendant Brown had to wheel Juan into the CDC in a wheelchair because Juan was unconscious and could not walk on his own, Defendant Beck saw during the book-in process at the CDC that Juan was completely unconscious and non-responsive to questions and his head was lying backward on the wheelchair because he was so unconscious he was incapable of holding his head up at all..

308.  Thus, Defendant Beck was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**Defendant Beck actually drew that inference.**

309.  Defendant Beck actually drew this inference because Juan was extremely intoxicated, unconscious, and "dead weight" when Defendant Beck first made contact with Juan, Defendant Beck and Defendant Brown had to physically lift, carry, and place Juan into the back of Defendant Beck's patrol vehicle due to Juan being unconscious, Defendant Beck saw that as Juan rode to the CDC in the back of Defendant Beck's patrol vehicle he was unconscious the entire time, was not moving, and was lying faced own on the seat, Defendant Beck and Defendant Brown had to physically lift Juan out of Defendant Beck's patrol vehicle and place him in a wheelchair because Juan was unconscious, his body was limp like a ragdoll, and he was "dead weight," Defendant Beck and Defendant Brown had to wheel Juan into the CDC in a wheelchair because Juan was unconscious and could not walk on his own, Defendant Beck saw during the book-in process at the CDC that Juan was completely unconscious and non-responsive to

questions and his head was lying backward on the wheelchair because he was so unconscious he was incapable of holding his head up at all.

310.    Further, Defendant Beck's actual knowledge of the substantial risk can be inferred because it was so obvious and <u>the need was so apparent that even laymen would recognize that care is required</u> – as Juan was extremely intoxicated, unconscious, and "dead weight" when Defendant Beck first made contact with Juan, Defendant Beck and Defendant Brown had to physically lift, carry, and place Juan into the back of Defendant Beck's patrol vehicle due to Juan being unconscious, Defendant Beck saw that as Juan rode to the CDC in the back of Defendant Beck's patrol vehicle he was unconscious the entire time, was not moving, and was lying faced own on the seat, Defendant Beck and Defendant Brown had to physically lift Juan out of Defendant Beck's patrol vehicle and place him in a wheelchair because Juan was unconscious, his body was limp like a ragdoll, and he was "dead weight," Defendant Beck and Defendant Brown had to wheel Juan into the CDC in a wheelchair because Juan was unconscious and could not walk on his own, Defendant Beck saw during the book-in process at the CDC that Juan was completely unconscious and non-responsive to questions and his head was lying backward on the wheelchair because he was so unconscious he was incapable of holding his head up at all. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Beck actually drew the inference that a substantial risk of serious harm existed.

311.    Accordingly, Defendant Beck was deliberately indifferent to Juan because Defendant Beck "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Juan when they got to the CDC and he was aware of

60

Juan's dire condition not improving from the time they left the scene with DFR. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

### **Defendant Brown was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

312.    Defendant Brown was aware of and ignored obvious indicia of a risk of serious harm, specifically including but not limited to, the facts that Juan was extremely intoxicated, unconscious, and "dead weight" when Defendant Brown first made contact with Juan, Defendant Brown and Defendant Beck had to physically lift, carry, and place Juan into the back of Defendant Beck's patrol vehicle due to Juan being unconscious, Defendant Brown and Defendant Beck had to physically lift Juan out of Defendant Beck's patrol vehicle and place him in a wheelchair because Juan was unconscious, his body was limp like a ragdoll, and he was "dead weight," Defendant Brown and Defendant Beck had to wheel Juan into the CDC in a wheelchair because Juan was unconscious and could not walk on his own, Defendant Brown saw during the book-in process at the CDC that Juan was completely unconscious and non-responsive to questions and his head was lying backward on the wheelchair because he was so unconscious he was incapable of holding his head up at all, Defendant Brown was present and heard Defendant Rumsey sarcastically state that he knew Juan was not going to remember what he told him and saw Defendant Rumsey laugh at how intoxicated Juan was, Defendant Brown also laughed at how intoxicated Juan was at the time, Defendant Rumsey asked Defendant Brown why Juan's arm was injured and the Defendant Brown responded that he believed Juan had fallen, Defendant Brown heard Defendant Rumsey ask Juan what his name was and receive no response from Juan, Defendant Brown heard Defendant Rumsey then ask Juan what his name was and Juan was unable to respond, Defendant Brown then heard

Defendant Rumsey ask Juan what his date of birth was Juan was unable to respond, Defendant Rumsey asked Defendants Beck and Brown two times if they were charging Juan with Public Intoxication because Defendant Rumsey "thought he was extremely intoxicated," as Defendant Rumsey attempted to talk with Juan, Defendant Brown saw that Juan did not and could not move, did not and could not speak, and did not and could not hold his head up, Defendant Brown witnessed Defendant Booker-Lewis physically hold Juan's head up while Defendant Rumsey attempted to speak to him, Defendant Brown then witnessed when Defendant Booker-Lewis let go of Juan's head and it fell without any indication that Juan was able to hold it up on his own.

313.    Thus, Defendant Brown was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### Defendant Brown actually drew that inference.

314.    Defendant Brown actually drew this inference because Juan was extremely intoxicated, unconscious, and "dead weight" when Defendant Brown first made contact with Juan, Defendant Brown and Defendant Beck had to physically lift, carry, and place Juan into the back of Defendant Beck's patrol vehicle due to Juan being unconscious, Defendant Brown and Defendant Beck had to physically lift Juan out of Defendant Beck's patrol vehicle and place him in a wheelchair because Juan was unconscious, his body was limp like a ragdoll, and he was "dead weight," Defendant Brown and Defendant Beck had to wheel Juan into the CDC in a wheelchair because Juan was unconscious and could not walk on his own, Defendant Brown saw during the book-in process at the CDC that Juan was completely unconscious and non-responsive to questions and his head was lying backward on the wheelchair because he was so unconscious he was incapable of holding his head up at all, Defendant Brown was present and heard Defendant Rumsey

sarcastically state that he knew Juan was not going to remember what he told him and saw Defendant Rumsey laugh at how intoxicated Juan was, Defendant Brown also laughed at how intoxicated Juan was at the time, Defendant Rumsey asked Defendant Brown why Juan's arm was injured and the Defendant Brown responded that he believed Juan had fallen, Defendant Brown heard Defendant Rumsey ask Juan what his name was and receive no response from Juan, Defendant Brown heard Defendant Rumsey then ask Juan what his name was and Juan was unable to respond, Defendant Brown then heard Defendant Rumsey ask Juan what his date of birth was Juan was unable to respond, Defendant Rumsey asked Defendants Beck and Brown two times if they were charging Juan with Public Intoxication because Defendant Rumsey "thought he was extremely intoxicated," as Defendant Rumsey attempted to talk with Juan, Defendant Brown saw that Juan did not and could not move, did not and could not speak, and did not and could not hold his head up, Defendant Brown witnessed Defendant Booker-Lewis physically hold Juan's head up while Defendant Rumsey attempted to speak to him, Defendant Brown then witnessed when Defendant Booker-Lewis let go of Juan's head and it fell without any indication that Juan was able to hold it up on his own.

315.    Further, Defendant Brown's actual knowledge of the substantial risk can be inferred because it was so obvious and <u>the need was so apparent that even laymen would recognize that care is required</u> – as Juan was extremely intoxicated, unconscious, and "dead weight" when Defendant Brown first made contact with Juan, Defendant Brown and Defendant Beck had to physically lift, carry, and place Juan into the back of Defendant Beck's patrol vehicle due to Juan being unconscious, Defendant Brown and Defendant Beck had to physically lift Juan out of Defendant Beck's patrol vehicle and place him in a wheelchair because Juan was unconscious, his body was limp like a ragdoll,

and he was "dead weight," Defendant Brown and Defendant Beck had to wheel Juan into the CDC in a wheelchair because Juan was unconscious and could not walk on his own, Defendant Brown saw during the book-in process at the CDC that Juan was completely unconscious and non-responsive to questions and his head was lying backward on the wheelchair because he was so unconscious he was incapable of holding his head up at all, Defendant Brown was present and heard Defendant Rumsey sarcastically state that he knew Juan was not going to remember what he told him and saw Defendant Rumsey laugh at how intoxicated Juan was, Defendant Brown also laughed at how intoxicated Juan was at the time, Defendant Rumsey asked Defendant Brown why Juan's arm was injured and the Defendant Brown responded that he believed Juan had fallen, Defendant Brown heard Defendant Rumsey ask Juan what his name was and receive no response from Juan, Defendant Brown heard Defendant Rumsey then ask Juan what his name was and Juan was unable to respond, Defendant Brown then heard Defendant Rumsey ask Juan what his date of birth was Juan was unable to respond, Defendant Rumsey asked Defendants Beck and Brown two times if they were charging Juan with Public Intoxication because Defendant Rumsey "thought he was extremely intoxicated," as Defendant Rumsey attempted to talk with Juan, Defendant Brown saw that Juan did not and could not move, did not and could not speak, and did not and could not hold his head up, Defendant Brown witnessed Defendant Booker-Lewis physically hold Juan's head up while Defendant Rumsey attempted to speak to him, Defendant Brown then witnessed when Defendant Booker-Lewis let go of Juan's head and it fell without any indication that Juan was able to hold it up on his own. *Dyer*, 964 F.3d at 380; *Easter*, 467 F.3d at 463; *Domino*, 239 F.3d at 756; *Gobert*, 463 F.3d at 345. Thus, Defendant Brown actually drew the inference that a substantial risk of serious harm existed.

316.    Accordingly, Defendant Brown was deliberately indifferent to Juan because Defendant Brown "refused to treat him … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care or summoning medical care for Juan when they got to the CDC and he was aware of Juan's dire condition not improving from the time they left the scene with DFR. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

### **Defendant Boeckel was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.**

317.    Defendant Boeckel was aware of and ignored obvious indicia of a risk of serious harm when he failed to check vitals or re-examine Juan during the second call, specifically including but not limited to, the facts that when Defendant Boeckel made contact with Juan after the second call of Juan falling, Juan was extremely intoxicated, non-responsive, unconscious, his body was limp like a ragdoll, his body was "dead weight," Juan was clearly in a worse condition than the prior call that night when Juan was able to stand on his own and walk away, Juan had now fallen twice to the point where a random person called 911 to assist Juan.

318.    Thus, Defendant Boeckel was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

### **Defendant Boeckel actually drew that inference.**

319.    Further, Defendant Boeckel's actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as a random person who upon information and belief was a laymen called 911 due to Juan's condition, when Defendant Boeckel made contact with Juan after the second call of Juan falling, Juan was extremely intoxicated,

non-responsive, unconscious, his body was limp like a ragdoll, his body was "dead weight," Juan was clearly in a worse condition than the prior call that night when Juan was able to stand on his own and walk away, Juan had now fallen twice to the point where a random person called 911 to assist Juan.

320.    Accordingly, Defendant Boeckel was deliberately indifferent to Juan because Defendant Boeckel "refused to treat him … or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care for Juan during his response to the second call of Juan falling and simply basing his analysis off of the vitals taken during the first call that night despite the fact that he was aware of Juan's dire condition during his response to the second call. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

### Defendant Featherston was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed.

321.    Defendant Featherston was aware of and ignored obvious indicia of a risk of serious harm when he failed to check vitals or re-examine Juan during the second call, specifically including but not limited to, the facts that when Defendant Featherston made contact with Juan after the second call of Juan falling, Juan was extremely intoxicated, non-responsive, unconscious, his body was limp like a ragdoll, his body was "dead weight," Juan was clearly in a worse condition than the prior call that night when Juan was able to stand on his own and walk away, Juan had now fallen twice to the point where a random person called 911 to assist Juan.

322.    Thus, Defendant Featherston was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed. *Dyer*, 964 F.3d at 380.

**Defendant Featherston actually drew that inference.**

323.   Further, Defendant Featherston actual knowledge of the substantial risk can be inferred because it was so obvious and the need was so apparent that even laymen would recognize that care is required – as a random person who upon information and belief was a laymen called 911 due to Juan's condition, when Defendant Featherston made contact with Juan after the second call of Juan falling, Juan was extremely intoxicated, non-responsive, unconscious, his body was limp like a ragdoll, his body was "dead weight," Juan was clearly in a worse condition than the prior call that night when Juan was able to stand on his own and walk away, Juan had now fallen twice to the point where a random person called 911 to assist Juan.

324.   Accordingly, Defendant Featherston was deliberately indifferent to Juan because Defendant Featherston "refused to treat him ... or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs" by not providing medical care for Juan during his response to the second call of Juan falling and simply basing his analysis off of the vitals taken during the first call that night despite the fact that he was aware of Juan's dire condition during his response to the second call. *Domino*, 239 F.3d at 756 (quoting *Johnson*, 759 F.2d at 1238).

**The Defendants' Deliberate Indifference Caused Juan's Injuries**

325.   As a direct result of Defendants Warren, Booker-Lewis, Rumsey, Houston, Beck, Brown, Boeckel, and Featherston failing to provide medical care and attention to Juan, he suffered physical injury, physical pain and suffering, mental anguish and emotional distress, and died, for which Plaintiff Juana Segovia, on behalf of the estate of Juan Segovia, sues herein.

326.   These injuries were not caused by any other means.

327.   Defendants Warren, Booker-Lewis, Rumsey, Houston, Beck, Brown, Boeckel, and Featherston were at all times acting under the color of law.

## COUNT II

### FAILURE TO SUPERVISE
### Violation of the Fourteenth Amendment Pursuant to 42 U.S.C. § 1983
### Defendant Rumsey

328.   Plaintiff repeats and re-alleges each and every allegation contained in the above paragraphs as if fully repeated herein.

329.   In a § 1983 claim for failure to supervise or train, the plaintiff must show that: "(1) the supervisor either failed to supervise or train the subordinate official; (2) a causal link exists between the failure to train or supervise and the violation of the plaintiff's rights; and (3) the failure to train or supervise amounts to deliberate indifference." *Goodman v. Harris Cty.*, 571 F.3d 388, 395 (5th Cir. 2009) (quoting *Smith v. Brenoettsy*, 158 F.3d 908, 911–12 (5th Cir.1998).

330.   "For an official to act with deliberate indifference, the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* (quoting *Smith*, 158 F.3d at 912.).

331.   In this case, Defendant Rumsey failed to supervise Defendants Warren, Booker-Lewis, and Houston.

332.   First, it is clear that Defendant Rumsey was aware of facts from which the inference could be drawn that a substantial risk of serious harm existed and Defendant Rumsey actually drew the inference that a substantial risk of serious harm existed because Defendant Rumsey was aware that Juan was extremely intoxicated, had to be wheeled in by a wheelchair because he was unable to walk, his body was limp like a ragdoll, he was incapable of standing and his body was "dead weight," he was unconscious, he was

incoherent, and then Defendant Rumsey sarcastically stated that he knew Juan was not going to remember what he told him and laughed, Defendant Ramsey was laughing at how intoxicated Juan was at the time, Defendant Rumsey asked Defendant Brown why Juan's arm was injured and Defendant Brown responded that he believed Juan had fallen, Defendant Rumsey was aware of facts showing that Juan was highly intoxicated, had fallen, was unconscious, and his body was limp in a wheelchair, Defendant Rumsey then asked Juan what his name was and received no response from Juan, Defendant Rumsey then asked Juan was his name was and claims he heard a "faint grunt," Defendant Rumsey then asked Juan what his date of birth was and claims he only heard Juan respond with a "faint grunt," Defendant Rumsey asked Defendants Beck and Brown two times if they were charging Juan with Public Intoxication because Defendant Rumsey "thought he was extremely intoxicated," as Defendant Rumsey attempted to talk with Juan, Juan did not and could not move, did not and could not speak, and did not and could not hold his head up, Defendant Booker-Lewis had to physically hold Juan's head up while Defendant Rumsey attempted to speak to him, when Defendant Booker-Lewis let go of Juan's head, it fell without any indication that Juan was able to hold it up on his own, Defendant Rumsey saw that Juan was dangerously intoxicated to the point often referred to as his body being like a "ragdoll" due to going completely limp, Defendant Houston voiced his concerns to Defendant Rumsey regarding Juan's medical condition, Defendant Rumsey did a check on Juan at 4:57 a.m. and saw that Juan was still unconscious and had vomited, Defendant Rumsey knew that Juan was unconscious, limp, and had fallen from what Defendant Brown told him when he was booked into the CDC at 9:54 p.m. the previous night and was still unconscious on the ground over seven hours later at 4:57 a.m., despite this information, Defendant Rumsey did not call for medical attention for Juan,

Defendant Rumsey waited over an hour until his shift was over and he told the oncoming Supervisor he might want to check on Juan, who had then been unconscious at the CDC for over eight hours, and Juan was not capable of getting help for himself and was relying exclusively on the CDC personnel to provide him with medical care.

333.   However, despite this information, Defendant Rumsey permitted Defendant Booker-Lewis, Defendant Brown, and Defendant Beck to complete the book-in process, permitted Juan to be admitted into the CDC, permitted Defendant Booker-Lewis to wheel Juan to the second floor to be housed in a holding cell, failed to ensure proper checks were taking place on Juan which should have caused there to be medical care summoned, permitted there to be only one officer stationed on the second floor at a time, left Juan lying unconscious in the cell next to his vomit after checking on him at 4:57 a.m. which ratified Defendant Warren's, Defendant Booker-Lewis', and Defendant Houston's conduct in not seeking medical care for Juan, did not seek medical care for Juan despite having the knowledge he did regarding Juan's condition, and did not instruct Defendant Warren, Defendant Booker-Lewis, Defendant Houston, or any other CDC personnel to seek medical attention for Juan, and did not even alert other CDC personnel to Juan's condition until an hour after the 4:57 a.m. check when he finally told the oncoming Supervisor, Sgt. Cortez, that he should have someone take a look at Juan.

334.   As a result, Defendant Rumsey was deliberately indifferent in failing to supervise Defendants Warren, Booker-Lewis, and Houston.

335.   As a result, his failure to supervise Defendants Warren, Book-Lewis, and Houston amounted to deliberate indifference.

336. Finally, there existed a causal link between Defendant Rumsey's failure to supervise and the violation of the plaintiffs' rights. *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 912.).

337. Had Defendant Rumsey taken steps to ensure Defendants Warren, Booker-Lewis, or Houston had provided Juan with medical care instead of simply ignoring him as he laid unconscious on the floor next to his own vomit for eight hours, Juan would not have continued to suffer and ultimately died.

338. Defendant Rumsey permitting Defendant Booker-Lewis to admit Juan into the CDC despite his clear need for medical attention and then Defendant Rumsey ratifying the conduct of Defendant Warren, Defendant Booker-Lewis, and Defendant Houston in not seeking medical attention for Juan, directly caused the harm to Juan outlined in this lawsuit.

339. As a result, (1) Defendant Rumsey failed to supervise Defendants Warren, Booker-Lewis, and Houston; (2) a causal link exists between the failure to supervise and the violation of Juan's rights; and (3) the failure to supervise amounts to deliberate indifference." *Goodman*, 571 F.3d at 395 (quoting *Smith*, 158 F.3d at 911–12).

340. Defendant Rumsey was at all times acting under the color of law.

## COUNT III

**PRACTICE AND CUSTOM OF DELIBERATE INDIFFERENCE**
***Monell v. New York City Department of Social Services***
**Violation of the Fourteenth Amendment**
**Pursuant to 42 U.S.C § 1983**
**Defendant City of Dallas**

341. Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

342.    Municipalities and other local governments are "persons" within the meaning of Section 1983 and can therefore be held liable for violating a person's constitutional rights. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 690 (1978); *Bonilla*, 982 F.3d at 308.

343.    Municipalities are, however, responsible only for "their own legal acts." *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020) (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986)). They cannot be held liable on a *respondeat superior* theory solely because they employ a constitutional tortfeasor. *Monell*, 436 U.S. at 691–92.

344.    Plaintiffs invoke two alternative theories of liability against the City of Dallas for the death of Juan: the "episodic acts and omissions" of City jailers, and the unconstitutional "conditions of confinement" at the City jail. *See Flores v. Cnty of Hardeman, Tex.*, 124 F.3d 736, 738 (5th Cir 1997).

345.    Plaintiff's episodic acts and omissions theory "requires a finding that particular jailers acted or failed to act with deliberate indifference to the detainee's needs" and––notably––that this conduct is attributable to the enforcement of a municipal policy, practice, or custom. *Sanchez v. Young Cnty., Tex.*, 866 F.3d 274, 279 (5th Cir. 2017).

346.    Plaintiff's conditions of confinement theory, in contrast, does not rest on the fault of individual jailers. *Id.* Rather, it challenges the conditions, practices, rules or restrictions of pretrial confinement imposed by Defendant City of Dallas that, together, "impose[] what amounts to punishment in advance of trial." *Id.*

347.    Under both theories, Plaintiff must show "(1) that a constitutional violation occurred and (2) that a municipal policy was the moving force behind the violation." *Sanchez*, 956 F.3d at 791 (quoting *Monell*, 436 U.S. at 694).

## Episodic Acts or Omissions Claim Against Defendant City of Dallas

348.    In an episodic acts or omissions claim against a municipality, "an actor usually is interposed between the detainee and the municipality, such that the detainee complains first of a particular act of, or omission by, the actor and then points derivatively to a policy, custom, or rule (or lack thereof) of the municipality that permitted or caused the act or omission." *Scott v. Moore*, 114 F.3d 51, 53 (5th Cir. 1997).

349.    To hold a municipal entity liable under this standard, the plaintiff must establish: "(1) a governmental employee acted with subjective deliberate indifference; and (2) the employee's act resulted from a policy or custom adopted or maintained with objective deliberate indifference to the plaintiff's constitutional rights." *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 526 (5th Cir. 1999).

350.    An official policy "usually exists in the form of written policy statements, ordinances, or regulations, but may also arise in the form of a widespread practice [of city officials or employees] that is 'so common and well-settled as to constitute a custom that fairly represents municipal policy.'" *James v. Harris Cnty.*, 577 F.3d 612, 617 (5th Cir. 2009) (quoting *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001)).

351.    Whatever its form, the policy must have been the "moving force" behind the plaintiff's constitutional violation. *Piotrowski*, 237 F.3d at 580 (quoting *Monell*, 436 U.S. at 694).

352.   Stated differently, Plaintiff "must show direct causation, i.e., that there was 'a direct causal link' between the policy and the violation." See *James*, 577 F.3d at 617 (quoting *Piotrowski*, 237 F.3d at 580).

353.   The policy must also have been "promulgated with deliberate indifference to the known or obvious consequences that constitutional violations would result." *Piotrowski*, 237 F.3d at 579 (internal quotation marks omitted).

354.   "A failure to adopt a policy rises to the level of deliberate indifference 'when it is obvious that the likely consequences of not adopting a policy will be a deprivation of civil rights.'" *Evans v. City of Marlin, Tex.*, 986 F.2d 104, 108 (5th Cir.1993) (quoting *Rhyne v. Henderson Cnty.*, 973 F.2d 386, 392 (5th Cir. 1992)).

355.   Establishing deliberate indifference on the part of a municipality generally requires a "pattern of similar violations" arising from a policy "so clearly inadequate as to be 'obviously likely to result in a constitutional violation.'" *Burge v. Saint Tammany Par.*, 336 F.3d 363, 370 (5th Cir. 2003) (quoting *Thompson v. Upshur Cnty.*, 245 F.3d 447, 459 (5th Cir. 2001)). A narrow 'single incident' exception to the pattern requirement, however, has been recognized. *Id.* at 372–73; *Covington v. City of Madisonville, Tex.*, 812 F. App'x 219, 225 (5th Cir. 2020). For deliberate indifference to be based on a single incident, "it should have been apparent to the policymaker that a constitutional violation was the highly predictable consequence of a particular policy." *Alvarez v. City of Brownsville*, 904 F.3d 382, 390 (5th Cir. 2018) (quoting *Burge*, 336 F.3d at 373).

### Conditions of Confinement Claim Against Defendant City of Dallas

356.   A challenge to a condition of confinement is a challenge to "general conditions, practices, rules, or restrictions of pretrial confinement." *Hare v. City of Corinth*, 74 F. 3d 633, 644–45 (5th Cir. 1996).

357.    The issue is whether the conditions "amount to punishment." *Bell*, 441 U.S. at 535.

358.    As has been explained, "if a restriction or condition is not reasonably related to a legitimate goal––if it is arbitrary or purposeless––a court permissibly may infer that the purpose of the government action is punishment that may not constitutionally be inflicted upon detainees.'" *Bell v. Wolfish*, 441 U.S. 520, 539 (1979); *Garza v. City of Donna*, 922 F.3d 626, 632 (5th Cir. 2019).

359.    If Defendant City of Dallas wishes to incarcerate intoxicated pretrial detainees in its detox cell, it has a constitutional responsibility to ensure that its conditions do not amount to "punishment" in advance of trial. And the protections of the Fourteenth Amendment do not hinge on whether a detainee makes an explicit request for medical care––especially when, as here, the detainee has is so intoxicated that he will never regain coherence.

360.    To prove a conditions of confinement claim, the plaintiff must show (1) a rule or restriction, an intended condition or practice, or a *de facto* policy as evidenced by sufficiently extended or pervasive acts of jail officials, (2) not reasonably related to a legitimate governmental objective, and (3) that violated [the detainee's] constitutional rights. *Shepherd v. Dallas Cnty.*, 591 F.3d 445, 452, 454–55 (5th Cir. 2009).

361.    In the Fifth Circuit, a conditions of confinement claim "requires no showing of specific intent on the part of the [municipality]." *Sanchez*, 866 F.3d at 279; *Edler v. Hockley Cnty. Comm'rs Ct.*, 589 F. App'x 664, 669 (5th Cir. 2014) ("[U]nlike an episodic-act-or-omission claim, a plaintiff is not required to prove deliberate indifference.").

362.    Although an unlawful condition or practice is often explicit, a "formal, written policy is not required." *Montano v. Orange Cnty., Tex.*, 842 F.3d 865, 875 (5th Cir. 2016); see *Shepherd*, 591 F.3d at 452.

363.    A condition may "reflect an unstated or *de facto* policy, as evidenced by a pattern of acts or omissions 'sufficiently extended or pervasive, or otherwise typical of extended or pervasive misconduct by [jail] officials, to prove an intended condition or practice.'" *Shepherd*, 591 F.3d at 452 (quoting *Hare*, 74 F.3d at 645).

364.    As noted by the Fifth Circuit, "specific [prior] examples are not required to meet the 'conditions or practice' element" when there is consistent testimony of jail employees, *Montano*, 842 F.3d at 877, or the policy maker knows about a misconduct yet fails to take remedial action, *Sanchez*, 956 F.3d at 793–94.

365.    When multiple employees act in the same unconstitutional manner, that is indicative of a *de facto* city policy. *See Sanchez*, 956 F.3d at 793 (finding that evidence that the county's written policies were ignored created fact-issues as to whether the jail had a *de facto* policy of inadequately monitoring intoxicated detainees).

366.    "We do not require a plaintiff to show that a 'policy or practice [was] the exclusive cause of the constitutional deprivation.' Courts 'may . . . consider how individual policies or practices interact with one another within the larger system.'" *See Sanchez*, 956 F.3d at 791.

367.    Municipal liability may attach where the constitutional deprivation is pursuant to a governmental custom, even if such custom has not received formal approval. *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 166 (5th Cir. 2010) (citing *Monell*, 436 U.S. at 690–91).

368.   The plaintiff may demonstrate a "persistent widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy." *Zarnow*, 614 F.3d at 168–69 (quoting *Webster v. City of Houston*, 735 F.2d 838, 841 (5th Cir.1984).

369.   "Under the decisions of the Supreme Court and [the Fifth Circuit], municipal liability under section 1983 requires proof of three elements: a policy maker; an official policy; and a violation of constitutional rights whose 'moving force' is the policy or custom." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citing *Monell*, 436 U.S. at 694).

370.   A municipality "cannot be liable for an unwritten custom unless '[a]ctual or constructive knowledge of such custom' is attributable to a city policymaker." *Pena v. City of Rio Grande City*, 879 F.3d 613, 623 (5th Cir. 2018) (citing *Hicks–Fields v. Harris Cty.*, 860 F.3d 803, 808 (5th Cir. 2017)).

371.   To establish municipal liability under § 1983 based on an alleged "persistent widespread practice or custom that is so common it could be said to represent municipal policy, actual or constructive knowledge of such practice or custom must be shown." *Malone v. City of Fort Worth*, 297 F. Supp. 3d 645, 654 (N.D. Tex. 2018) (citing *Hicks–Fields*, 860 F.3d at 808).

372.   "Constructive knowledge may be attributed to the governing body on the ground that it would have known of the violations if it had properly exercised its responsibilities..." *Hicks–Fields*, 860 F.3d at 808.

373.     In *City of Oklahoma City*, 471 U.S. at 823, the Supreme Court described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives."

## POLICYMAKER

### City Council and Chief Deputy Marshal

374.     The identification of policymaking officials is a question of state law. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988).

375.     Because the "specific identity of the policymaker is a legal question that need not be pled," plaintiffs can state a claim for municipal liability as long as they plead sufficient facts to allow the court to reasonably infer that the Board either adopted a policy that caused M.L.'s injury or delegated to a subordinate officer the authority to adopt such a policy. *Longoria Next Friend of M.L. v. San Benito Indep. Consol. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019); quoting *Groden v. City of Dallas*, 826 F.3d 280, 284, 286 (5th Cir. 2016).

376.     In other words, plaintiffs must plead facts that sufficiently connect the policymaker [...] to the allegedly unconstitutional policy [...]. *Id.*

377.     Here, the City Council is the policymaker for the City of Dallas who is responsible for the policies of the DFR.

378.     Here, the City Council is the policymaker for the City of Dallas who is responsible for the policies in the CDC.

379.     The City Council, as policymaker for the City, promulgated, adopted, approved, and/or ratified the policies discussed in this lawsuit after reviewing the policies following the deaths of each individual outlined above.

380.    Alternatively, the City Council had constructive knowledge of these customs, practices, and *de facto* policies as they would have known of the violations if they would have properly exercised their responsibilities…" following the deaths of each individual outlined above. *Hicks–Fields*, 860 F.3d at 808.

381.    Alternatively, the City Council, as policymaker for the City, delegated policymaking authority to promulgate, adopt, approve, or ratify the policies discussed in this lawsuit related to the CDC to the Chief Deputy Marshal for the City of Dallas.



PURPOSE

To establish procedures and guidelines for the operation of the City Detention Center and for the safe housing and care of prisoners in custody at the City Detention Center.

SCOPE

This procedure applies to all personnel assigned to City Detention Center.

382.    The above photograph is a snapshot of the heading of the City's policies for the CDC which were in effect on June 30, 2019 and July 1, 2019.

383.    The red box on the photograph above identifies the person with the authority to approve – and the person who did in fact approve – the City's policies as they relate to the CDC in the City of Dallas Document titled Detention Center and with the Document number of CTS-PRO-801.

384.    The person identified in the red box above is Georgette Johnson.

385.    Georgette Johnson held the position of Chief Deputy Marshal for the City.

386.   Accordingly, the City Council delegated to the Chief Deputy Marshal, Georgette Johnson, the authority to adopt policies on behalf of the City as they related to the CDC. *Longoria Next Friend of M.L.*, 942 F.3d at 271; quoting *Groden*, 826 F.3d at 284, 286.

387.   Upon information and belief, discovery into information within the knowledge of the City will show that the Dallas City Council and/or the Chief Deputy Marshal for the City of Dallas promulgated, adopted, approved, and/or ratified the policies discussed in this lawsuit after reviewing the policies following the deaths of each individual outlined above.

388.   Upon information and belief, discovery into information within the knowledge of the City will show that the Dallas City Council and/or the Chief Deputy Marshal for the City of Dallas had constructive knowledge of the customs, practices, and *de facto* policies outlined in this lawsuit, as they would have known of the violations if they would have properly exercised their responsibilities…" following the deaths of each individual outlined above. Hicks–Fields, 860 F.3d at 808.

## Policy, Custom, and Practice
## Which was Moving Force of Constitutional Violations

389.   The § 1983 causation component requires that the plaintiff identify, with particularity, the policies or practices they allege cause the constitutional violation, and demonstrate a "direct causal link." *M. D. by Stukenberg v. Abbott*, 907 F.3d 237, 255 (5th Cir. 2018); See *Piotrowski*, 237 F.3d at 580. The Fifth Circuit does not, however, require the court to consider each policy or practice in a vacuum. *Id*. The court may properly consider how individual policies or practices interact with one another within the larger system and how the harmful effects of some policies are exacerbated by others. *Id*.

390.    The Supreme Court has described an actionable *Monell* policy as "a course of action consciously chosen among various alternatives." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823, 105 S. Ct. 2427, 2436, 85 L. Ed. 2d 791 (1985).

391.    The policymaker for the City consciously chose each of the policies outlined in this lawsuit over various available alternatives.

### Policy, Custom, Practice, and Culture of
### Reducing Costs by Denying Necessary Medical Care

392.    The City's policies caused people incarcerated at the CDC to suffer in agony without receiving medical attention until passed the point where medical intervention could save them.

393.    Plaintiff has plead detailed facts above, relevant to inadequate medical care, which are incorporated as if set-out fully herein which support:

  a.    Official policies, longstanding practices and/or customs existed at the CDC which were implemented by the final policymaking officials for the City.

  b.    Policymakers for the City knew or should have known about the policies and/or practices and customs which created *de facto* policies at the CDC;

  c.    The policymakers for the City were deliberately indifferent in promulgating these policies and/or permitting these *de facto* policies to persist; and

  d.    The City's policies and/or customs were the moving force leading to the constitutional violation of failing to provide adequate medical care for Juan causing his injuries and ultimately his death.

394.    Plaintiff has pleaded facts to support that the City was deliberately indifferent because they disregarded known or obvious consequence of their policies and practices. The City clearly knew of the policies and knew that these policies were likely to

cause constitutional violations by way of the obvious nature of not requiring medical care for dangerously intoxicated persons in their custody and control as well as the numerous deaths outlined above which were caused by these very issues.

395.   The City's policies and practices include each policy listed in this lawsuit, which include, but are not limited to:

   a. A custom or practice of not requiring officers to fully complete the MSF with correct information or to mark answers as "no" even if the person is unable to respond with an answer because they are too intoxicated or unconscious;

   b. Not requiring arrestees such as Juan to undergo a mental health evaluation and/or receive mental health care prior to being booked into the CDC;

   c. Not having an employee on site that could perform mental health evaluations on arrestees such as Juan prior to being booked into the CDC;

   d. Not requiring arrestees such as Juan to undergo a medical evaluation and/or receive medical care from an on-staff employee prior to being booked into the CDC;

   e. Not having an employee on site that could perform medical evaluations on arrestees such as Juan prior to being booked into the CDC;

   f. Not requiring a new medical evaluation at the CDC and relying on the medical clearance from DFR at the location of the arrest to suffice as medical clearance during the book-in process, despite time passing between the arrest site medical clearance and the book-in process where arrestees such as Juan could see their condition deteriorate to the point of needing medical attention;

g.  Not requiring DFR firetruck personnel to document arrestee vitals like the same paramedics would have to do if they were in a DFR ambulance;

h.  Not requiring a new medical evaluation at the CDC and relying on the medical clearance from DFR at the location of the arrest to suffice as medical clearance during the book-in process, knowing that if the DFR personnel who gave clearance at the arrest scene were on an DFR firetruck then vitals would not have been documented and possibly not even taken, like in this case with Juan;

i.  Allowing people such as Juan to "detox" without appropriate jail and/or medical staff present;

j.  Ignoring inmates in the CDC who were dangerously intoxicated, were perceived as withdrawing from illegal drugs and/or alcohol, and/or had other serious mental health and/or medical issues;

k.  Fabricating observation logs and checks when the observations and checks were not actually occurring;

l.  Not requiring arrestees such as Juan to have their vitals taken at the CDC to determine if they should be admitted or if they need medical attention, like is the common practice at the vast majority of jails and detention centers in the state of Texas;

m.  Not using any medical procedures and/or well-accepted withdrawal protocols for inmates who are suffering the effects of drug and/or alcohol intoxication and/or abuse, such as Juan;

n.  Assigning only one officer to the second floor where dangerously intoxicated inmates such as Juan were being housed and only one person was not

83

enough to adequately monitor all of the inmates in the various holding cells and solitary cells;

o.  Assigning only one officer to the control desk with the responsibility of monitoring the actions of all inmates at the same time, while also requiring that officer to leave the control desk to perform cell checks so that no officer would be monitoring the inmates in any cell that was not being physically checked by the control desk monitor at that time;

p.  Assigning only one officer to the control desk and requiring that officer to perform in-cell checks; however, not permitting officers to do in-cell checks without a second officer present;

q.  Allowing officers to perform their cell checks by remaining at the control desk and viewing the monitors on the computer which show video from the group holding cells, when the video footage is not clear enough to show whether an inmate is unconscious, had vomited, or is distress;

r.  Permitting arrestees to be booked into the CDC when they are unconscious;

s.  Not summoning paramedics when persons at the CDC are unconscious;

t.  Permitting arrestees to be booked into the CDC when they are incoherent;

u.  Not summoning paramedics when persons at the CDC are incoherent;

v.  Permitting arrestees to be booked into the CDC when they are incapable of standing or moving due to intoxication;

w.  Not summoning paramedics when persons at the CDC are incapable of standing or moving due to intoxication;

396.  It is clear that the harmful effects of all of the City's policies and practices exacerbated the harmful effects of each other.

84

397.    This Court is not required to consider each policy or practice in a vacuum but may instead properly consider how each individual policy or practice interacts with one another within the larger system which the City put together and how the harmful effects of many of the City's policies are exacerbated by others. *M. D. by Stukenberg*, 907 F.3d at 255; *See Piotrowski*, 237 F.3d at 580.

398.    None of the City's policies, practices, customs, or *de facto* policies outlined in this lawsuit are reasonably related to a legitimate governmental objective.

399.    Upon information and belief, discovery into information within the knowledge of the City will show that the City's policymaker consciously chose each of the policies, practices, customs, and *de facto* policies outlined in this lawsuit over various available alternatives.

400.    The City's deliberately indifferent policies, practices, customs, and *de facto* policies caused Defendants Warren, Booker-Lewis, Rumsey, Houston, Boeckel, and Featherston to show the subjective deliberate indifference toward Juan's health and safety outlined above by each Defendant, as each of these defendants were acting pursuant to these policies when they were subjectively deliberately indifferent toward Juan's health and safety.

401.    As a result of these unconstitutional policies, practices, customs, and *de facto* policies, Juan was denied adequate medical care in violation of his rights pursuant to the Fourteenth Amendment to the United States Constitution and he suffered physical injury, physical pain and suffering, mental anguish and emotional distress, and died.

402.    These injuries were not caused by any other means.

## Count Four

## **WRONGFUL DEATH**
## **Against All Defendants**

403.   Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

404.   Plaintiff Juana Segovia is Juan Segovia's mother.

405.   Plaintiff Manuel Segovia is Juan Segovia's father.

406.   Plaintiff Angie Segovia is Juan Segovia's daughter.

407.   Plaintiff Evelyn Segovia is Juan Segovia's daughter.

408.   By reason of Defendants Warren, Booker-Lewis, Rumsey, Houston, Beck, Brown, Boeckel, and Featherston's wrongful conduct of failing to provide Juan medical care despite his clear and obvious need for medical attention due to his signs and symptoms demonstrating an imminent threat of serious harm without said care, Defendants Warren, Booker-Lewis, Rumsey, Houston, Beck, Brown, Boeckel, and Featherston are liable for damages.

409.   By reason of Defendant City of Dallas's deliberately indifferent policies, practices, and customs, which caused Defendants Warren, Booker-Lewis, Rumsey, Houston, Boeckel, and Featherston to show deliberate indifference to Juan's health and safety, Defendant City of Dallas is liable for damages.

410.   To recover on a wrongful death claim under 42 U.S.C. § 1983, a plaintiff who has standing must show both (1) the alleged constitutional deprivation required by 42 U.S.C. § 1983 and (2) the causal link between the defendant's unconstitutional acts or omissions and the death of the victim.

411.    Defendants Warren, Booker-Lewis, Rumsey, Houston, Beck, Brown, Boeckel, and Featherston's deliberate indifference shown toward Juan's health and safety, as described herein, violated Juan's constitutional rights under the Fourteenth Amendment to adequate medical care and caused his death.

412.    Defendants Warren, Booker-Lewis, Rumsey, Houston, Beck, Brown, Boeckel, and Featherston's conduct that caused Juan's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendants Warren, Booker-Lewis, Rumsey, Houston, Beck, Brown, Boeckel, and Featherston are liable for their acts and infliction of emotional distress caused by the wrongful death of Juan.

413.    Defendant City of Dallas' deliberate indifference, as described herein, caused the deliberate indifference shown toward Juan, which violated Juan Segovia's constitutional rights under the Fourteenth Amendment to adequate medical care and caused his death.

414.    Defendant City of Dallas' conduct that caused Juan's death was a producing cause of injury, which resulted in the following damages: loss of a family relationship, love, support, services, emotional pain and suffering, and Defendant City of Dallas is liable for its acts and infliction of emotional distress caused by the wrongful death of Juan.

415.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

## Count Five

### SURVIVAL ACTION
### Against All Defendants

416.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

417.    Plaintiff Juana Segovia brings this claim as the prospective Personal Representative of the Estate of Juan Segovia.

418.    Juan died because of the Defendants' wrongful conduct outlined in this lawsuit.

419.    Juan would have been entitled to bring this action against the Defendants if he had lived.

420.    The Decedent's right of action for wrongful conduct against the Defendants survives in favor of the estate of the deceased.

421.    The Defendants are liable to the Estate of the deceased for the loss of Juan's life, pain and suffering, and the violation of his constitutional rights.

422.    Plaintiffs seek compensation as set forth more specifically in the section of this Complaint entitled "Damages."

### V.
### PUNITIVE DAMAGES

423.    Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

424.    When viewed objectively from the standpoint of the Individual Defendants, at the time of the occurrence, their conduct involved an extreme degree of risk, considering the probability and magnitude of the potential harm to others.

425.   As a direct, proximate, and producing cause and the intentional, egregious, malicious conduct by the Individual Defendants, Plaintiffs are entitled to recover punitive damages in an amount within the jurisdictional limits of this Court.

# VI.
# DAMAGES

426.   Plaintiffs repeat and re-allege each and every allegation contained in the above paragraphs as if fully repeated herein.

427.   Plaintiffs' injuries were a foreseeable event. Those injuries were directly and proximately caused by the Defendants' deliberate indifference shown toward Juan Segovia and their unconstitutional policies applied against Juan Segovia.

428.   As a result, Plaintiffs are entitled to recover all actual damages allowed by law. Plaintiffs contend the Individual Defendants' conduct constitutes malice, evil intent, or reckless or callous indifference to Juan's constitutionally protected rights. Thus, Plaintiffs are entitled to punitive damages against the Individual Defendants.

429.   As a direct and proximate result of the occurrence which made the basis of this lawsuit, Plaintiffs have been forced to suffer:

a.   Actual damages;
b.   Loss of affection, consortium, comfort, financial assistance, protection, and care;
c.   Pain and suffering and mental anguish suffered by Juan prior to his death;
d.   Mental anguish and emotional distress suffered by Plaintiffs;
e.   Loss of quality of life;
f.   Funeral and burial expenses;
g.   Loss of service;
h.   Loss of earnings and contributions to Plaintiffs;
i.   Prejudgment interest; and
j.   Post judgment interest.

430.    Pursuant to 42 U.S.C. § 1983 and 1988, Plaintiffs seek to recover, and hereby requests the award of punitive damages, reasonable attorney's fees, and costs of court.

## VII.
## ATTORNEY'S FEES

431.    If Plaintiffs prevail in this action, by settlement or otherwise, Plaintiffs are entitled to and hereby demand attorney's fees under 42 U.S.C. §1988.

## VIII.
## JURY REQUEST

432.    Plaintiffs respectfully request a jury trial.

## PRAYER

WHEREFORE, PREMISES CONSIDERED, Plaintiffs prays that judgment be rendered against Defendants, for an amount in excess of the jurisdictional minimum of this Court. Plaintiffs further pray for all other relief, both legal and equitable, to which they may show themselves justly entitled.

Respectfully submitted,

*/s/ Scott H. Palmer*
SCOTT H. PALMER,
Texas Bar No. 00797196

*/s/ James P. Roberts*
JAMES P. ROBERTS,
Texas Bar No. 24105721

SCOTT H. PALMER, P.C.
15455 Dallas Parkway, Suite 540
Addison, Texas 75001
Telephone: 214.987.4100
Facsimile: 214.922.9900
scott@scottpalmerlaw.com
james@scottpalmerlaw.com

COUNSEL FOR PLAINTIFF